**WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. PEAVY–WILSON LUMBER CO., Inc.**

No. 213.

District Court, W. D. Louisiana, Shreveport Division.

April 15, 1943.

848

Irving J. Levy, Acting Sol., Mortimer B. Wolf, Asst. Sol., and Bessie Margolin, and Carroll A. Cahen, Attys., United States Department of Labor, all of Washington, D. C., for plaintiff.

R. F. Maguire and J. R. Wells, of Maguire, Voorhis & Wells, both of Orlando, Fla., John B. Files, of Shreveport, La., and James W. Peavy of Lufkin, Tex., for defendant.

PORTERIE, District Judge.

The following statement is to serve a dual purpose: a narrative of the case and a partial findings of fact.

Defendant is a corporation organized under the laws of the State of Louisaiana, having its principal office in Louisiana within the jurisdiction of this court. It is engaged in the lumber manufacturing business at Holopaw, Osceola County, in the State of Florida, where it owns and operates a large sawmill, a planing mill, and all necessary appurtenances, and a lumber yard. It also owns timberlands located in Osceola County and Orange County, Florida.

The officers of defendant are: A. J. Peavy, Chairman of the Board; D. L. Handley, President; R. T. Moore, Vice-President; T. E. Trigg, Vice-President; S. G. Sample, Vice-President; J. S. Welsh, Secretary-Treasurer. There are 139 stockholders in defendant company. Its capital stock is $1,000,000.

In connection with its lumber-manufacturing operations in Florida, defendant employed, during the period from October 24, 1938, through October 31, 1941, an average of approximately 325 employees, exclusive of executive, office and company store employees. These employees have been and are engaged in various classes of work which include the felling of timber, transporting of logs from the timberlands to the manufacturing plant, and the different operations at the manufacturing plant. Approximately 200 are employed at the mill and about 125 are employed in log-cutting,

skidding, right-of-way and track-laying operations in the woods.

During the period from October 24, 1938, through October 31, 1941, defendant's lumber sales amounted to between $800,000 and $900,000 annually. Substantial portions of the lumber manufactured by defendant are shipped by it to points outside the state of Florida. Some interstate shipments were made practically every day during the aforesaid period, and substantial amounts were shipped in interstate commerce every week during such period. During this three-year period defendant shipped directly out of the state a total of 12,458,296 board feet of lumber to some 26 states and to Ontario and Quebec, Canada, the invoice price of which, less freight, amounted to over half a million dollars ($532,202.00). Substantial additional amounts of lumber were produced for lumber dealers in Florida for subsequent shipment by such dealers to points out of the state of Florida.

During the period involved in this suit, defendant continuously manufactured its lumber with the intent or expectation that some unsegregated part of it would be shipped in interstate commerce. All employees of defendant employed in defendant's woods, sawmill, planing mill and shipping operations, and all employees engaged in any processes or occupations necessary to these operations, in and about Holopaw, Florida, have been engaged in this production of lumber, unsegregated quantities of which have been regularly transported, offered for transportation, or shipped to points outside the state of Florida by the defendant during every week in which defendant has operated since October 24, 1938, through October 31, 1941.

Holopaw, Florida, is, for all practical purposes, a company-owned town. There are some 265 tenant houses, a large general store, and several churches, mainly built with funds of the company, located in the vicinity of the sawmill and business office of defendant. Defendant has been operating its plant at Holopaw since February, 1934. The plant, including the sawmill, the power house, and other appurtenant buildings, together with some 200 tenant houses comprising the town, was purchased in February, 1934, from the J. M. Griffin Lumber Company at a total lump sum price of $82,500.

The J. M. Griffin Lumber Company in about the years 1924–1926 constructed on a four-hundred acre tract—contiguous to the original community—a sawmill and sawmill village which included some 270 dwellings for white and negro employees, boarding houses, hotels, a sawmill, planing mill, power plant, water and light plant, a general merchandising store building, and sundry appurtenant buildings. The property so constructed and developed by the J. M. Griffin Lumber Company was appraised as of December 1, 1926, by Coats and Burchard Company, a nationally known appraisal company, at a then reproductive value of $1,393,805.37.

The town of Holopaw is situated upon Florida State Highway No. 29, a paved highway leading directly from the city of Orlando through Holopaw to Melbourne and the East Coast of Florida. The community is located seventeen miles southeast of St. Cloud, the nearest town of any consequence. The community of Holopaw is served by three stores; the largest is that operated by Peavy-Wilson Lumber Company, a general merchandising store which has done an annual business with gross sales to $150,000 and which draws trade from as far as 25 miles; another is a general store operated by the Stevens Tie and Lumber Co. which is about a third the size of the Peavy-Wilson Lumber Co. store; and the third is a small store operated by J. M. Sullivan.

The employees of the company may, but are in no manner required to, rent dwellings from the company. They may trade at the company store but that is strictly a matter of choice. The small store operated by the railroad tie company has offered no serious competition to defendant's store, though all the laborers are free to purchase at the other stores, or at the city of Orlando and at St. Cloud, Kissimmee, the county seat, and elsewhere, and, also, are free to order goods from wherever they please. The company store carries a full assortment of merchandise and the prices are invariably not higher than elsewhere, not higher even than in the nearby city of Orlando, and ofttimes cheaper.

The Administrator's regulations, part 531, defining the term "reasonable cost" to the employer "of furnishing" the employee "with board, lodging, or other facilities" with respect to Section 3(m) of the Act, 29 U.S.C.A. § 203(m), were issued after an informal conference between Mr. Joseph Rauh, Jr., of the Wage and Hour Division, and certain individuals, arranged by Mr. Walter White, Assistant to the

Chairman of the Business Advisory Council of the Department of Commerce, and with the consent of the Administrator of the Fair Labor Standards Act, 29 U.S.C. A. § 201 et seq. This informal conference was held in Washington, D. C., on October 17, 1938. It was attended by several individuals who, when acting in their official characters or capacities of employment, were connected with certain trade associations, which included two coal associations, the National Petroleum Association, the Textile Association, the Southeastern Railways Association, the American Mining Congress, the National Sand and Gravel Association, and the National Lumber Manufacturers Association. These individuals were invited to give of such knowledge as they might have with respect to the effect of the regulations on the businesses which might be affected. According to Mr. Walter White, who arranged the informal conference, those invited were expected to contribute such knowledge as they had of the industries to be influenced by the regulations. "They were told they were to come there to discuss this matter, but not in any way to commit any member of their association if they happened to be an association man." Under the terms of the invitation extended it was understood they were not to commit themselves or any organization or industry.

Mr. Henry Bahr, who was Assistant to the Secretary-Manager of the National Lumber Manufacturers Association, was in attendance at the informal conference. He was requested by Mr. Joseph Rauh, Jr., then an attorney on the staff of the General Counsel of the Wage and Hour Division, not to remove the draft of the regulations from the room nor to discuss the conference or the provisions of the proposed regulations with any of the companies in the lumber industry. It does not appear from the evidence in this case that any lumber manufacturer was ever advised of the regulations until after their adoption. The defendant is a member of the Southern Pine Association and the Southern Pine Association is a subscriber to the services of the National Lumber Manufacturers Association.

The Administrator's regulations provide a procedure whereby an employer might apply for a specific determination of the cost of board, lodging and other facilities furnished by him. It appears that defendant, while not making a formal demand for such determination, did request that the Administrator assist it in ascertaining the appropriate charge to be made as rental for dwellings and in the working out of an appropriate formula in operating the company store.

Upon the passage of the Fair Labor Standards Act, Mr. A. J. Peavy, then President and Executive Officer of Peavy-Wilson Lumber Company, Inc., instructed Mr. D. L. Handley, then Vice-President in charge of the operations of the plant, to comply with the Fair Labor Standards Act. The first contact that any representative of the company had with a representative of the Wage and Hour Law was in March of 1939 when Mr. Handley met Mr. Andrews, then Administrator of the Fair Labor Standards Act, in New Orleans, Louisiana. Mr. Andrews was there for the purpose of speaking to lumbermen, and told Mr. Handley and the others in attendance that " * * * anybody who made an honest effort to try and comply with the Act would get all the assistance that they needed from the Department in order that they could comply with it." While Mr. Handley was in New Orleans, on March 22, 1939, an inspector of the Wage and Hour Division, a Mr. Wilson, came to Holopaw and there spent a day. He talked with Mr. Max Handley, a son of Mr. D. L. Handley and a bookkeeper for the company. While in Holopaw, Mr. Wilson interviewed some of the employees, went over the payroll records at the office and took a transcript of some of them. In so doing he was assisted by the bookkeeper of the company. Mr. Wilson in no wise advised whether practices engaged in by the company in relation to its employees were a violation of the law.

In July, 1939, Mr. Wilson returned to the plant and there conducted an investigation, on July 6, 7, 13, 14, 17, 18 and 19. Mr. D. L. Handley was present and explained in great detail to Mr. Wilson every practice engaged in by the company with respect to its employees; all types of charges made to their payroll accounts; the basis upon which such charges were made, at whose directions and what for; the full history of the manner of issuing and using coupons, the reasons why coupons were used and the arrangements made with the community barber, given in detail later.

The next contact Mr. Handley or any other representative of the company had with the Wage and Hour Division was a

day or two prior to November 3, 1939, when a Mr. Funston, then an attorney for the Department, called Mr. Handley on long distance telephone and simply requested that he meet him, a representative of the Wage and Hour Division, at the Angebilt Hotel in Orlando on November 3, 1939. Mr. Handley complied with the request and there met Mr. Funston, and also a Mr. Vernon K. Gimson, a principal witness for the plaintiff in this case. Without ado Mr. Funston then demanded that the company sign a consent decree providing for a general injunction prohibiting it from violating any provision of the Fair Labor Standards Act and any regulation issued by the Administrator thereunder. Mr. Handley asked for the privilege of consulting his attorney, which was granted.

On that day, November 3, after the conference, the defendant's attorney addressed a letter to Mr. Funston, as attorney for the Wage and Hour Division in Washington, reiterating the desire of the company to comply with the law and all valid regulations, and requested a particularization of alleged violations—two contentions only having been stated at the conference with respect to violations, namely: that the rental charged for houses, water and lights exceeded the reasonable cost, and that the use of coupon books was a violation of the law. Defendant's attorney on several occasions thereafter requested a particularization of the alleged violations of the Act, but was advised by the Assistant General Counsel of the Wage and Hour Division that no such information would be given, and a conference was arranged in Washington for December 11 and 12, 1939. At this Washington conference, where were present Mr. Levy, Assistant General Counsel of, Mr. Funston, attorney for, the Wage and Hour Division, Mr. Handley, Mr. Maguire, attorney for defendant, and others, all facts pertaining to the transactions between the company and its employees were frankly discussed. Mr. Handley told the counsel of the Wage and Hour Division of his desire for help in working out formulas that would enable the company to comply with the law. He then made proposals for the achievement of this end, which the attorneys agreed to consider. Such proposals were detailed by Mr. Maguire in a letter to the attorneys for the Department of Labor, dated December 13, 1939, and the letter was filed in evidence in this case. No formal application, however, was made

for a particular hearing as provided by the Regulations.

The letter proposals were ineffective and, we believe, were impossible, because the parties differed fundamentally on the law; and, consequently, this suit had to be filed.

Notwithstanding the institution of this suit, the defendant thereafter cooperated with the representatives of the Administrator during the weeks of their checking of the records of the company. It furnished all records requested that could have any bearing upon the suit and permitted the representatives to take and study elsewhere, and make photostatic copies of, those of the records desired.

During the period from October 24, 1938, through October 31, 1941, defendant made numerous deductions from the wages of almost all of its employees, including deductions for coupons issued in lieu of cash wages, for rent of company-owned houses, for purchases at the company store, for drugs, for tools, for ice water and water coolers, for medical attention, for loans and advances, and for a number of other things. By reason of the location of defendant's plant, practically the only living quarters, and the only source of food, water and essential supplies available to employees were those furnished by the defendant.

During the first year of the operation of the Fair Labor Standards Act approximately 250 of defendant's hourly rate employees were employed at the bare minimum rate, according to defendant's records. During the two succeeding years the number so employed was approximately 210.

Although the Administrator's regulations provided a procedure whereby any employer might apply for a specific determination of the cost of particular facilities furnished by him, defendant never filed such an application or petition.

For at least a year after the effective date of the Act, defendant paid employees their earnings in scrip or coupons in lieu of cash, if the employee requested his pay between the regular bi-monthly pay days. On the back outside cover of the coupon books the following statement was written: "The coupons in this book are good only for merchandise purchased at the store of Peavy-Wilson Lumber Company, Inc., and will not be replaced if lost. They are not Transferable."

These coupons had no regular redemption date. They could be redeemed in cash only

at 90 per cent. of face value. For the first few months after the operative date of the Act, defendant itself discounted the scrip in cash at 90 per cent. of the face value. Thereafter (about January, 1939), defendant made a deal with the town barber, Mr. Homer Ett, whereby the barber was given the privilege of discounting the scrip, and in return the rent payable to the company by the barber for the building used as a barber shop was raised from $40 per month to $75. When the discounting was subsequently discontinued, the barber's rent was reduced again to $40 per month. In addition to the increase in the barber's rent, the defendant, when it observed the profits being made by the barber from the discounting, required the barber to give the company 40 per cent. of his discount.

■ By the above negotiations defendant continued to profit from the discounting of coupons. Since the effective date of the Act, employees of defendant have been deprived of some of their wages by the discounting transactions. Some employees receiving the bare minimum wage were victims of these discounts, which repeatedly reduced their weekly wages below the minimum required by Section 6 of the Fair Labor Standards Act. Such discounting, therefore, resulted in repeated violations of Section 6 of the Act. Defendant discontinued the issuance of scrip on November 3, 1939, after there had been two inspections of defendant's plant by a Wage and Hour Division inspector and when it appeared that litigation would be instituted by the Administrator. Shortly before discontinuing the issuance of coupons defendant had ordered a large stock of the coupon books, which books were on hand at the time suit was instituted and remained unused, and were a loss of nearly $500.00 to the defendant.

Previous to discontinuance, some amount of scrip or coupons was used at the company store where merchandise, groceries, and other goods were sold to employees, and these articles were not furnished at the actual cost to defendant within the meaning of Section 3(m) of the Act and the Administrator's Regulations, Part 531.

A number of employees employed at the bare minimum wage made purchases at the company store with coupons for which deductions were made from their wages. Therefore these deductions resulted in

numerous and repeated violations of Section 6 of the Act.

Further findings of fact will be found unsegregated in the body of the opinion, when decision is made on housing rentals, store operations, tools, milk and ice service, community medical service, travel and walking time, and record keeping.

We have considered this case before. A motion to dismiss, comprising, in the main, an attack on the constitutional grounds, was not sustained, in Jacobs v. Peavy-Wilson Lumber Co., D.C., 33 F. Supp. 206. In that opinion, 33 F.Supp. at page 211, we said: "The constitutionality of the phrase 'board, lodging, or other facilities' in Section 3(m), interpreted so as to include 'medicines and drugs, clothing, groceries, foodstuffs, meats and other commodities', has not been decided."

■ The Act has been definitely validated as to constitutionality in the case of United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, but Section 3(m) has been untouched and uninterpreted, and the validity of the various regulations of the Administrator of the Wage and Hour Division under Section 3(m) has never been presented.

Accordingly, before passing upon the merits as to whether or not the injunction should issue in any manner, that is, generally inclusive of all points of violation or only modifiedly prohibiting the repetition of certain acts, or should issue at all, we should consider the attack seriously made by defendant on (a) the meaning of Section 3(m), (b) the validity, effect and meaning of the regulations purported to be issued under Section 3(m), and dispose of the constitutional questions involved in considering Section 3(m) and the regulations under it.

The defendant has first presented for our detailed consideration: I. The meaning of Section 3(m). The subdivisions under this general heading are: A. What is the meaning of "Board, Lodging, or Other Facilities"? B. The meaning of "Reasonable Cost of Furnishing"; and C. The section has no application to mutual accountings. II. The validity, effect and meaning of regulations purported to be issued under Section 3(m). And under this heading is pressed that: A. There has never been a determination of "The Reasonable Cost of Furnishing" under this section, such as is contemplated by Sec-

tion 3(m); and under this heading are the following subdivisions: 1. The authority given to the Administrator by Section 3(m) is to determine "The Reasonable Cost of Furnishing" as a fact, not to define "Reasonable Cost of Furnishing", or to provide a general formula by which "The Reasonable Cost of Furnishing" may be determined; and 2. Regulations issued by a Federal officer do not have any force or effect as laws unless there has been Congressional authorization therefor; and 3. The Administrator has never made such a determination as is contemplated by Section 3(m) and, of course, has no right to file a suit on account of a violation of Section 3(m) until such a determination has been made. B. If the regulations issued by the Administrator mean that property owned by employers at the time the Wage and Hour Law went into effect and later used in furnishing board, lodging and other facilities to employees is to be valued on the basis of its original cost rather than on its then value in computing depreciation and return on investment, the regulations issued are unreasonable, create a rule out of harmony with the statute, and are mere nullities. C. The regulations should, of course, if possible, be construed in such a way as to be in harmony with the statutory standard; and it is possible so to construe the Regulations. III. Constitutional questions involved in considering Section 3(m) and the regulations issued thereunder. And under this general heading appear the following subheads: A. Section 3(m) and the Regulations issued thereunder, if construed in accordance with the contentions of plaintiff, deprive defendant of his property without due process of law and without just compensation. B. The Act and the Regulations deprive defendant of its property without procedural due process. C. Section 3(m) and the Regulations issued thereunder are fatally indefinite, uncertain and impossible of compliance.

For the purpose of ready reference, we quote Section 3(m): "(m) 'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."

The first big issue between the parties to this litigation is whether or not "or other facilities", under accepted statutory construction, would include, since the phrase follows the words "board, lodging", under the rule of construction commonly known as ejusdem generis, the general sale of groceries, shoes, clothing, and household effects in a store operated by the defendant, or the relationship of landlord and tenant, since the defendant company rents houses by the month to its employees. The defendant claims that the other facilities referred to could very well include a cafeteria, a restaurant, or a hotel operated by an employer and patronized by his employees, and may very well include coal, kerosene, firewood, electricity, water, gas, laundry, telephone service, to be given as an incident to and in connection with "board" or "lodging". Defendant further claims that the plaintiff is not warranted in seeking to stretch "or other facilities" as used in Section 3(m), following the specific words "board" and "lodging", to embrace the business of merchandising or the relationship of landlord and tenant.

It is not necessary for us to quote the many decisions which have clearly defined the difference between furnishing board and lodging, which generally connotes the legal relation between the keeper of an inn and his guest, and the meaning of landlord and tenant on the one hand, and storekeeper and customer on the other. Among the numerous cases is the case of Coggins v. Gregorio, 10 Cir., 97 F.2d 948, at page 950, from which we quote: " * * * The principal distinction between the two relations [lodginghouse keeper and lodger, and landlord and tenant] is that the tenant acquires an interest in the real estate and has the exclusive possession of the leased premises, while the lodger acquires no estate and has merely the use without the actual or exclusive possession."

In ruling on Section 3(m), the court is well impressed with the fact that we are interpreting an excerpt from the actual statute and that the court is free to arrive at its own conclusion and is not of necessity to be controlled by the Administrator's views as represented by regulations drawn by him from the section.

The rule of statutory construction commonly known as that of ejusdem generis is well accepted, not only be our Federal courts but generally by the courts of our various states. Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522;

Reiche v. Smythe, 13 Wall. 162, 22 L.Ed. 566; United States v. Salen, 235 U.S. 237, 35 S. Ct. 51, 59 L.Ed. 210; Rorick v. Devon Syndicate, 307 U.S. 299, 59 S.Ct. 877, 83 L.Ed. 1303.

We believe that one of the state cases, Anderson & Kerr Drilling Co. v. Bruhlmeyer, Tex.Civ.App., 115 S.W.2d 1212, says that the principle of "ejusdem generis" frequently employed in the construction of statutes suggests that where general words follow the enumeration of particular classes or persons or things, the general words shall be construed as applicable only to persons or things of the same general nature or kind as there enumerated.

See, also, South West Missouri Light Co. v. Scheurich et al., 174 Mo. 235, 73 S.W. 496, 498; Riverside County v. Yawman & Erbe Mfg. Co., 3 Cal.App. 691, 86 P. 900; Gates & Son Co. v. City of Richmond, 103 Va. 702, 49 S.E. 965, 966; People v. Richards, 108 N.Y. 137, 15 N.E. 371, 375, 376, 2 Am.St.Rep. 373.

One of the textbook writers, Sutherland, on Statutory Construction, § 268, says: "Where there are general words following particular and specific words, the former must be confined to things of the same kind."

The plaintiff, in answer to defendant's contention that neither rented houses nor company stores are included within the scope of Section 3(m), first admits that there is not much legislative history on the language of Section 3(m) prior to the enactment of the Act on June 25, 1938.

To this first point the defendant says that the legislative history demonstrates that the House of Representatives was not interested in including housing in Section 3(m) along with board and lodging because there was an amendment offered by Congressman Crawford, as follows:

" 'Wage' paid to an employee includes the reasonable cost, as determined by the Secretary, to the employer of such employee of furnishing such employee board, lodging, housing, or other facilities, if such board, lodging, housing or other facilities are customarily furnished by such employer to his employee free of charge."

This amendment was not passed, and it would seem to be obvious that the word "housing" was the cause of its rejection; and the defendant counters further that the Administrator is to determine the reasonable cost of board, lodging or other facilities in the light of the judicial construction to be given the words of the Congress, because in the case of Powell v. United States of America, 300 U.S. 276, 57 S.Ct. 470, 476, 81 L.Ed. 643, we find:

"Unless the project is one covered by section 1(18) [49 U.S.C.A. § 1(18)], the Commission is not authorized by the act to consider whether it is in the public interest and, for lack of jurisdiction to determine that question, it must deny the application. Upon presentation by the carrier of application for a certificate, the Commission, for the purpose of determining whether it is authorized by the act to consider the merits, may pass incidentally upon the question whether the project is one covered by section 1(18). But the decision of that question is for the court in either a suit to set aside an order granting a certificate or in a suit under section 1(20) to enjoin a violation of section 1(18). The function of the court is to construe that paragraph; that of the Commission is to determine whether the project, if it is one covered by the paragraph, is in the public interest."

The defendant adds further that no court has defined board, lodging or other facilities, as used in Section 3(m), to include the relation of landlord and tenant or the relation of merchant and customer, or has covered any of the relationships existing between the defendant and its employees with respect to either merchandising or housing. And that the assertion is made notwithstanding the cases of Morgan v. Atlantic Coast Line R. Co., D.C., 32 F.Supp. 617, 618, 619; Williams v. Atlantic Coast Line Railway Co., 3 Wage-Hour Reporter 82; Fleming v. Pearson Hardwood Flooring Co., D.C. 39 F.Supp. 300. We have read these last cases and they have coercive features of which the record in this case is utterly devoid, and in some cases represented deductions for weekly and monthly house rent for abandoned, dilapidated houses along the railroad lines which the laborers sometimes did not even use, though charged for their use. The houses rented in the instant case were habitable and were all fully and regularly used.

The plaintiff admits that the verbiage of Section 3(m) came out of the conference committee of both houses of Congress on June 12, 1938. The plaintiff's position (the government's) is that the Act is essentially a *cash* wage statute, that Section 6(a) of

the Act *literally* requires the payment of the basic wage in cash only, and that Section 3(m) provides the only exceptions to the cash wage requirement. The contention of the government is that the purpose of Section 3(m) is to protect the basic wage from indiscriminate and unlimited deductions for charges arising out of profit-making transactions between employer and employee, and that this purpose would be wholly defeated unless the phrase "or other facilities" be interpreted so as to include the relation of landlord and tenant, merchant and customer.

The representatives of the government make the point very seriously that the purpose of Congress in its enactment of Section 3(m) was to protect against abuses of the company village system. They admit that prior to the enactment of the act there was no discussion or debate regarding the precise definition of the words "board, lodging, or other facilities". They seem to overlook the Crawford amendment, previously quoted, but show that the Congressional debates on wage and hour legislation contain many references to the necessity of protecting "victims of low wage scale and the company store system."

Congressman Dies, in offering an amendment which would make it a crime for an employer to evade or attempt to evade the provisions of the Act by increasing charges for *housing, fuel* and *lights* furnished to his employees (83 Cong.Rec., Part 7, p. 7277), used the following language: "The need of this amendment should be apparent to everyone * * *. It is plain to see that chiseling employers will increase these charges for housing, fuel and lights in order to offset the increase in the wages of those who receive less than the minimum provided in the bill, and legitimate employers will be placed at a great disadvantage and in the end the act will be so completely evaded that it will amount to nothing."

Congressman Crawford, in offering an amendment to the House bill, said: "Mr. Chairman, we face a practical fact that where board, lodging, or housing is furnished, unless it is taken into consideration, charges for that service will be increased in proportion to the amount of the wage increase. This amendment leaves the matter entirely up to the Secretary of Labor, and in behalf of the employee this type of relationship should be brought into the definition part of the act and made a part of the act. Everyone understands it; there

is no need of taking a lot of time to discuss it or explain it. In the coal industry, and in many other industries, there is this realistic thing to deal with, and I think it must have been an oversight on the part of the committee in leaving that out of the definition portion of the bill."

■ The case of Gooch v. United States, *supra*, states that the rule of ejusdem generis in our federal courts is "firmly established", then goes further and develops an exception to the rule in the following language (56 S.Ct. at page 397): "The rule of ejusdem generis, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified; but it may not be used to defeat the obvious purpose of legislation. And, while penal statutes are narrowly construed, this does not require rejection of that sense of the words which best harmonizes with the context and the end in view." (Citing a number of cases)

Then, our query has resolved itself to the question of what was the obvious purpose of the Congress in the enactment of 3(m)?

Amendments were offered to the Fair Labor Standards Act in the spring of 1940, and we quote in particular the following amendment to Section 3(m), offered by Representative Kitchens of Arkansas (86 Cong.Rec. No. 84, p. 7961, April 29, 1940): "(m) 'Wage' paid to any employee may include a reasonable *charge,* as determined by the Administrator, for the furnishing to such employee of board, lodging or other facilities." (Italics supplied.)

Opposition to the above proposal was made by Congressman Ramspeck in the following language: "The amendment offered by the gentleman from Arkansas [Kitchens] states that the wage paid to any employee may include a reasonable charge determined by the Administrator for the furnishing of such employee with board. The difference between the present law and the amendment, as I understand it, is that under the present law the charge is limited to the *actual cost* and under the amendment offered by the gentleman from Arkansas the employer would be permitted to charge more than cost if it were a reasonable charge as determined by the Administrator. I do not see, personally, why an employer should be permitted to

charge more than the *cost* of board or lodging, if he undertakes to furnish them to an employee, and I hope the Committee will reject the amendment." (Italics supplied)

The amendment was rejected on April 29, 1940. 86 Cong.Rec. No. 84, at p. 7963. Mr. Kitchens again introduced his amendment on May 1, 1940. 86 Cong. Rec. No. 86, at p. 8214. After debate, the amendment was decisively defeated by the House sitting as a committee of the whole. 86 Cong.Rec. No. 86, p. 8214. The fact that the Administrator's regulation had been in effect for almost two years prior to the debates on this proposed amendment, and Congress expressly considered the regulation and refused to legislate an amendment, is compelling evidence that the Administrator's regulation was in harmony with Congressional intent.

Or, it might be as well put to say that the refusal by the Congress to amend is the equivalent of an enactment of the present Regulation of the Administrator by the Congress.

Frankly, we must admit that the purpose of the Regulation was to attempt to eliminate the ills of the past existing in our mining and lumber industries, and, in certain cases, was to prevent an invasion of the Act through profit-making transactions between employer and employee in which the employee is generally recognized not to be on equal contracting terms with his employer. So, though the question be close, we rule that the phrase "or other facilities" is to include the relation of landlord and tenant, and merchant and customer, and further, that subsection (b) of Section 531.1 of the Original Regulations of the Administrator, issued October 20, 1938, is legally permissible.

A condition of numerous accountings existed between defendant and its employees such as we know to be very common at sawmill plants; in truth, we doubt that there would be an exception in all of the southeastern United States.

Long prior to the filing of suit in this case defendant established the custom of accommodating employees by making payments for their accounts, at their requests and upon their respective orders, and charging the amounts so paid against the payroll accounts of the employees respectively. For instance, the company would pay accruing premiums on insurance policies held by the employee and charge to his account the amount of the premium. At the request of a negro employee or a white employee, as the case might be, the company paid money into one of the two charity funds, one wholly controlled and handled by the negroes, and the other wholly controlled and handled by the white employees. If an employee suscribed a certain amount each month or week to the support of one of the churches in the community of which he was a member, the company would pay the amount of his subscription and charge it to his account if given an order to do so. The company would pay orders given by the employee to the community barber and to the person operating the community pressing club. The company would, at the employee's request, make payments on account of an automobile. The company handled orders given by the employee, drawn on it, to pay for gasoline and for innumerable other things, including the taking up for the employee of C.O.D. packages from mail order houses at the Post Office. Each of such advancements was charged to the extent, and to the extent only, of the moneys paid out. Nothing whatsoever was charged to the employee by the company on account of the cost of rendering such service or the cost of stationery and stamps which might be used in complying with the employee's requests. If an employee owed a third person money he would frequently give to his creditor an order on the company in discharge of his debt. All of such payments amounted to courtesies extended by the defendant to its employees. It is the testimony of the bookkeepers in the bookkeeping department of the defendant that they expended thirty-five per cent. of their time in rendering gratuitous and unrequired services to the employees. Obviously such services greatly extended the amount of bookkeeping required and caused the defendant to incur a very substantial expense. All of such things were done for the benefit and the convenience of the employees.

The defendant accommodated its employees in the arrangement made with respect to milk and ice furnished by the milk and ice suppliers, and there was, also, a system of mutual accounting established to operate the medical service.

In addition to the foregoing, an employee could purchase from the company wood for fuel at a cost actually less than the cost of delivery and such charge for wood

was charged to the payroll account. To a small degree employees purchased on credit groceries and supplies from the company store, the purchase price of which was charged to the employees' payroll accounts. The same thing was true and for the most part during the same period of time, i.e. prior to the early part of December, 1939, with respect to rent on houses rented by the employees of defendant. The employee well knew that each of the charges referred to created a debt by him immediately due and owing to the company and that at the end of the then current accounting period the money by him owing to the company would be balanced against the money up to that time earned by the employee, and a balance struck, and that on the next ensuing pay day the company would pay to the employee in cash money the balance, if any, then owing by it to the employee. Under such circumstances the employee was due the company a certain amount of money and the company was due the employee a certain amount of money. As a practical matter nothing was to be gained by the ceremony of the company paying to the employee the total amount of his wages in cash money and the employee then turning around and paying to the company, likewise in cash money, the amount of any indebtedness owing by the employee to the company. Moneys were actually paid to the extent only of balances due. That the transactions between the employer defendant and the employees were on a basis entirely voluntary, and further, that the defendant in dealing with its employees never at any time exercised coercion of any character, is very clear.

We agree with the conclusion so well expressed in plaintiff's brief, in the following language: "It is apparent that the clear intention of Congress, in enacting section 3(m), was to protect the basic minimum wage and overtime compensation required to be paid to the employee, from profiteering or manipulation by the employer in dealings with his employees; and in particular to prevent increases in charges for rent, board, groceries and merchandise, so as to offset the increase in wages provided and intended by the Act. The reasonableness of the Administrator's determination, therefore, must be weighed in the light of that purpose. The 'actual cost' standard adopted by the Administrator was deemed to be the most workable, if not the only practicable, way to achieve this purpose."

However, the recent decisions have been in the nature of a declaration to the effect that laborers enjoy freedom of contract and are still possessed of initiative. The very concept of what an American should be exacts that he should be left with freedom to decide and to act. In other words, the government, through regulations and exactions, by jealously keeping the employer and employee so commercially apart, would become so patriarchal as to deprive the average American of any free will, and our millions of laborers would be converted to a docility and dumbness which would undermine our real standards.

And we think we are supported by the language of Associate Justice Reed in the case of Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, at page 671, 86 L.Ed. 914, when he says: "Congress approached the problem of improving labor conditions by the establishment of a minimum wage in certain industries. It required that workers in these industries receive a compensation at least as great as that fixed by the Act. Except for that requirement the employer was left free, in so far as the Act was concerned, to work out the compensation problem in his own way. Other courts are in accord with our view. Harrison v. Kansas City Terminal R. Co., D.C., 36 F.Supp. 434; Harrison v. Terminal R. Ass'n of St. Louis [8 Cir., 126 F.2d 421] 4 C. C. H. Labor Cases ¶ 60,-346; Ryan v. Denver Union Terminal Co. [10 Cir., 126 F.2d 782] id., ¶ 60,618."

Without going into the detailed facts of the Jacksonville Terminal case, supra, we believe that the general background and tenor are to the effect that laborers (terminal red caps) enjoy the right to contract, and exercise the privilege of exacting performance from the employer; the laborers, in turn, have the satisfaction of fulfilling their obligation. It is to be noted in this case that the Supreme Court took jurisdiction because of the divergence of views in our circuit courts, and certiorari was granted because of the importance of the fundamental issues.

A placing side by side of Section 6(a) and Section 3(m) of the Act, we believe, will disclose the absence of any prohibition of mutual accountings between employer and employees. The provision from 6(a) that every employer shall pay not less than 25¢ an hour, though fully indicative that the payment should be in cash, does not denote the want of authority

in the laborer to contract that some of the cash due him be paid for this, to that one, and the other. The long record in this case discloses no coercion, to even the slightest degree, as to what the employee had or had not to order or direct to be paid from his cash wages. Further, the record shows a complete absence of evidence showing any one of the laborers to have been defrauded of one cent in any of the numerous types of accountings and for a period of better than three years.

We believe that in the case of Southern Ry. Co. v. Black, 4 Cir., 127 F.2d 280, 283, the following language is proof that the purpose of the Fair Labor Standards Act was not to interfere with the methods and practices by which an employee's compensation is to be paid (127 F.2d at page 283): "The purpose of Congress in the passage of the Fair Labor Standards Act was to provide that employees be compensated for their labor at not less than the minimum wage, not to interfere with the methods and practices by which the compensation was paid (Williams v. Jacksonville Terminal Co., supra); and if the employee receives for his labor the minimum which the statute requires, it cannot be important whether he receives it direct from the employer or, with the employer's consent, from the employer's patrons."

In the case of Ryan v. Denver Union Terminal R. Co., 10 Cir., 126 F.2d 782, 4 Labor Cases 60,618, we have the following language: "The law does not say how that shall be paid, except that they are guaranteed the $2.00 or $2.40 a day."

We believe that we should quote further from the Jacksonville Terminal case, supra, 62 S.Ct. at pages 669, 671:

"We stated in the discussion of the notice given by the terminals to their employees that its effect was to transfer the tips covered by the notice to the credit of the terminals. But this terminal credit in the hands of the red caps, assert petitioners in both cases, cannot be utilized as cash paid to the employee by the employer. * * *

"To interpret 'pay-wages' as limited to money passing from the terminal to the red cap would let construction of an important statute turn on a narrow technicality. It, of course, can make no practical difference whether the red caps first turn in their tips and then receive their minimum wage or are charged with the tips received up to the minimum wage per hour."

And finally, to sustain and better express the general principle we have attempted to pronounce, we quote from the case of Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, at page 1229, 86 L. Ed. 1716: "When employer and employees have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with irregular hours. Where the question is as close as this one, it is well to follow the Congressional lead and to afford the fullest possible scope to agreements among the individuals who are actually affected."

■ We believe there is nothing in the Act to prohibit an employer and employee from agreeing on an amount for house rent or agreeing upon the purchase price of an article of merchandise, provided there be not the prohibited profit of the Administrator's Regulation made in the transaction; and further, we see nothing in the Act to prevent the further voluntary agreement, either expressed or implied, that the amount of house rent or the price of the merchandise may be deducted from the wage due.

Though we believe the position of the court to be well sustained by these recent utterances of the Supreme Court of the United States, it is interesting to note that among the most distinguished of our legal minds, when speaking as presiding judges in state courts, found there was no offense to morals or justice in any accountings of this character between the employer and the employees. Mr. Justice Holmes in the case of Gallagher v. Hathaway Mfg. Co., 172 Mass. 230, 51 N.E. 1086, 1087, when interpreting a statute requiring certain employers "to pay weekly each employé engaged in its business the wages earned by such employé to within six days of the date of such payment," wrote, as follows: "It surely would not encounter either the words or spirit of the law if an employer should lend his workman money to be set against his next week's wages."

And, by analogy, he held that the deduction of other lawful indebtednesses might likewise be made, stating: "If the fine was lawful, as we have decided that it was,

the payment of it might be arranged for in the same way."

In the same connection Mr. Justice Holmes commented further: "The plaintiff has been paid all that is due to her. She was overpaid one week, and was bound to repay the amount. We see nothing to prevent her agreeing that such an overpayment should go into a mutual account for the next week, and reduce the sum due."

The most striking language in support of this present-day tenor of our courts is that of Judge Hutcheson, found in the Belo Corporation case, when it was in the Circuit Court: "Freedom of contract, within constitutionally valid limitations, is, in the United States of America, one of the fundamental freedoms and this is particularly so in regard to labor relations. When, then, it is contended as here, that a statute has cut off or limited this freedom, a litigant must point to something more than his opinion that it ought to be cut off or limited, must point to language clearly and validly so providing. There is no more authoritative principle in the field of labor law than that, subject of course, to valid statutes designed to prohibit substandard conditions and unfair labor practices, wages, hours, and work conditions are the proper subject of contract between employer and employee and their agreements must be, and are, given full effect in the courts." Fleming v. A. H. Belo Corporation, 5 Cir., 121 F.2d 207, 214.

Circuit Judge Sibley, in his opinion in the Jacksonville Terminal case, supra, when it was in the Circuit Court (5 Cir., 118 F.2d 324, 327) shows that the provision of 6(a), though apparently dictating the payment of wages in cash, has its exceptions, through the provisions of Section 3(m) of the Act, when he says: "The provision of Section 3(m), 29 U.S.C.A. § 203(m), ' "Wage" paid to any employee includes reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities * * *', refers to wage payments other than in money, * * *.'"

We repeat, therefore, that we find no transgression of the law in these mutual accountings.

 The channel through which the defendant is brought under the General Hearing that the Administrator informally held before the issuance of the Original Regulations, dated Oct. 20, 1938, effective Oct. 22, 1938, denominated Section 531.1, was defendant's membership in the Southern Pine Association, which is an auxiliary member of the National Lumber Manufacturers Association, whose Assistant to the Secretary-Manager was in attendance at the conference. Opp. Cotton Mills v. Administrator of Wage, etc., 5 Cir., 111 F. 2d 23.

This is sufficient notice of or hearing to the defendant under the law, but we hold, additionally, that defendant's silence in never requesting "a hearing to determine the reasonable cost to an employer of the board, lodging, or other facilities, customarily furnished", as provided by Section 531.2 (Oct. 20, 1938), and by Section 531.2 (Amd. Reg. Sept. 12, 1940), precludes defendant from pleading now in this suit the want of due notice of or actual hearing. Consequently, there was and there is due process of law, in substance and in procedure. The previous determination, we find, under the facts, also gave the plaintiff the right to file suit.

The informal hearing was sufficient to provide a general formula; the right to a determination of the reasonable cost of furnishing as a particular fact to cover the instant case was lost to the defendant by its own inaction.

The Administrator and the defendant were widely and radically apart—not so much on facts, but on the interpretation of the Act, a noteworthy, because controlling, instance being on the meaning of Section 3(m). The defendant believed then—and we daresay believes now—that the Administrator has no business to inquire about either the store operations or the house rent charges.

A particular hearing before the Administrator (a declared and open advocate of diametrically opposite legal principles) was not requested by the defendant, because the conclusions of the hearing on the law were readily predictable and were absolutely undesired by the defendant. The oral proposals, as well as the written proposals (letter to attorneys of Department of Labor, dated Dec. 13, 1939) could not bring an adjustment, because of defendant's legal predicates, which were impossible of acceptance by the Administrator. Conferences, interviews, letters, and even a particular hearing—never sought—could not reconcile the views of the Administrator and the views of the defendant on the meaning, interpretation and application of the Act. This suit was inevitable.

We should immediately bring to our mind here that the plant, which the estimate of Coats and Burchard Company, reputable professionals in the line, estimated as being worth $1,393,805 in 1926, was bought by the defendant for the relatively small sum of $82,500. The plaintiff contends that the actual cost of the houses is $10,065—the proportionate part for the village houses out of the total plant cost—and that this actual cost should serve as the basis for the computation of rent cost. The defendant contends that they made a tremendously good bargain when they purchased this plant in the very depth of the depression, and that the capital outlay on which to compute the rental they should receive from the village houses should be based on the actual value or worth of the houses at the time they are rented, irrespective of the low purchase price. We could not imagine any case where the factual background could draw the issue of difference in interpretation more sharply and widely than in this case.

The plaintiff asserts the validity of the provisions outlined by the Administrator in Regulations, Part 531, published in the Federal Registry, October 20, 1938, wherein is stated that "reasonable cost" is "not more than the *actual* cost to the employer of the board, lodging or other facilities customarily furnished * * * to * * * employees." (Emphasis supplied.) Although the Administrator determined that "reasonable cost does not include a profit to an employer or to any affiliated person", the Regulations do provide for a "reasonable allowance (not more than 5½%) for interest on the depreciated amount of capital invested by the employer". This allowance is in addition to the expenses of "operation and maintenance including adequate depreciation."

The argument of the defendant is that "reasonable cost" means a return on "fair value", and that, insofar as the Administrator's determination deviates from the "fair value" concept, it is unconstitutional.

The plaintiff's position may be outlined as follows: 1. The Administrator's determination as set forth in Regulations, Part 531, is binding as legislation and cannot be set aside or modified by the courts unless palpably arbitrary or capricious, or unless unconstitutional.

2. The Administrator's regulation is a valid exercise of the authority conferred upon him by section 3(m) and is clearly designed and adapted to achieve the purpose of Congress.

A. The literal language of the statute, as well as the legislative history, established that "cost" and not "fair value" was intended to be the standard in enforcing section 3(m).

B. The "actual cost" standard is the only practicable interpretation if the purpose of section 3(m) to prevent evasions of the Act is to be accomplished.

3. There is no constitutional requirement entitling employers to a return on the value of services or facilities furnished in lieu of wages.

We agree with plaintiff's view that the Administrator's Regulation under Section 3(m), defining what is thereunder "reasonable cost", as just above quoted, to be the "actual cost", is legally correct.

We do not fail to realize the hardship on the defendant in such a rule because it robs the defendant of the fruits of a prudent good bargain; and, concomitantly and additionally, we realize that if there be no reward for astuteness in business the converse will become true, that there will be no punishment for poor dealings. What we mean here is that the defendant might as well have paid the Coats and Burchard estimate for the plant of $400,000 when it bought on February 6, 1934, instead of just paying $82,500.

The reason why we may legally and conscientiously take this position in the face of a full appreciation of its shortcomings and difficulties is that we firmly adhere to the plaintiff's position that we are not dealing here with the "fair value" principles applied in public utility rate making, nor are we dealing here with a direct and comprehensive regulation of prices to be charged by grocery stores and landlords; we are dealing primarily in shaping and maintaining minimum wage and maximum hour standards for employees engaged in interstate commerce or the production of goods for interstate commerce, and consequently any regulation of prices charged for rent or merchandise resulting from the operation of Section 3(m) is merely incidental to the accomplishment of the wage and hour standard provided by the Act. The charges made by ordinary landlords and merchants are not affected at all by Section 3(m), nor are the charges made by the employer regulated, except to the extent to which the employer *may choose*

866

*to furnish facilities* in lieu of the minimum wages and the overtime compensation required by the substantive provisions of the Act.

■■ The determination by the Administrator in Regulations, Part 531, is binding as legislation and cannot be set aside or modified by the courts unless palpably arbitrary or capricious, or unless unconstitutional. The Congress may delegate to administrative agencies the power to issue regulations, having the force and effect which they would have if Congress itself had written the regulations into the statute. Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; United States v. George S. Bush & Co., Inc., 1940, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259; American Tel. & Tel. Co. v. United States, 1936, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142; Pacific States Box & Basket Co. v. White, 1935, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; United States v. Shreveport Grain & Elevator Co., 1932, 287 U.S. 77, 58 S.Ct. 42, 77 L.Ed. 175; Currin v. Wallace, 1939, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Avent v. United States, 1924, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202; United States v. Grimaud, 1911, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; In re Kollock, 1897, 165 U.S. 526, 17 S.Ct. 444, 41 L.Ed. 813; Belden v. Chase, 1893, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218; McKinley v. United States, 1919, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668; Buttfield v. Stranahan, 1904, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; Boske v. Comingore, 1900, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846.

■ We believe that since Section 3 (m), as interpreted by the Administrator's Regulation, is plainly designed and adapted to the constitutional end of enforcing fair wage and hour standards, the fact that curtailment of the employer's profits from the sale of merchandise and the renting of houses to employees incidentally results, cannot invalidate the regulation.

■ · Secondly, the constitutional objection urged by the defendant cannot prevail. Even if it be assumed that Congress is without power directly to regulate prices of grocery stores and amounts· charged by landlords generally, regulations providing the conditions under which such charges may be credited to an employer **as** wages paid are clearly valid as "appropri-ate aids to the accomplishment of some purpose within an admitted power of the national government." See United States v. Darby, 312 U.S. 100, 121, 657, 61 S.Ct. 451, 460, 85 L.Ed. 609, 132 A.L.R. 1430.

■ The due process clause is not violated either. In the case of Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, at pages 512, 514, 78 L.Ed. 940, 89 A.L.R. 1469, we find the following language:

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. * * *

"The due process clause makes no mention ρf sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago."

#### Store Operations.

Since we have ruled and held valid the Administrator's Regulations under 3(m), we should quote here the regulation affecting store operations, since it is to be the basic premise of this discussion:

"Section 531.1—Reasonable cost under section 3(m) of the act.

"The term 'reasonable cost' in section 3(m) of the act is hereby determined to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees.

"(a) Reasonable cost does not include a profit to the employer or to any affiliated person.

"(b) The reasonable cost to the employer of furnishing the employee board, lodging or other facilities (including housing) is hereby determined to be the cost of operation and maintenance including adequate depreciation plus a reasonable allowance (not more than $5\frac{1}{2}$ per cent) for interest on the depreciated amount of capital invested by the employer; provided that if the total so computed is more than the fair rental value (or the fair price of the com-

modities or facilities offered for sale), the fair rental value (or the fair price of the commodities or facilities offered for sale) shall be the reasonable cost. The cost of operation and maintenance, the rate of depreciation, and the depreciated amount of capital invested by the employer shall be those arrived at under good accounting practices."

To avoid duplicity, the items in the findings of fact which may relate to the store operations are not repeated here, but should be borne clearly in mind as permanent premises.

We shall now make a comparison of plaintiff's figures as to defendant's alleged profits and of defendant's figures as to the actual want of profits in the store operation. Plaintiff in its Exhibit 23 shows that defendant for the year 1939 derived a net profit of $20,643.34 from the operation of the general store; the gross business being approximately $149,000.00; the opinion of plaintiff's expert was that the total cost of store operation was $12,082.04; consequently the cost of store operation was approximately 8% of sales. The defendant has made much reference to the studies of the George F. Baker Foundation, found in Bureau of Business Research Bulletin 115, Harvard University, Vol. 29, No. 1, May, 1942, page vi. This bulletin discloses that in the case of general merchants in similar situation as the defendant and for the same year, the cost of doing their business as compared to the sales was 36.50%, or fractionally more than four times the 8% allowed by the government's expert in the instant case. Furthermore, in the year 1939 it is interesting to observe that the gross profit on sales of Peavy-Wilson Lumber Company was only fractionally more than 20 per cent. as compared with the gross profit of 36.8 per cent of merchants who were only enabled to make from their merchandizing business .4 of 1 per cent. Quoting from the conclusion in defendant's brief: "A reference to page 16, Table 8 of said publication shows that the goal figures of cost for general stores with a business of $150,000.00 and less is 27 per cent. and obviously, presuming a like cost to Peavy-Wilson Lumber Company, its cost of store operations would have been $40,376.17, or a net loss for the year's business of $7,650.79. That is, of course, presuming that the general store of Peavy-Wilson Lumber Company, doing a business of less than $150,000.00 per annum, is measuring up to that of which the George F. Baker Foundation Bureau of Business Research conceives to be the acme of success in the carrying on of a general merchandising business. In this connection it is interesting to note that the total expenses of Peavy-Wilson Lumber Company, exclusive of income taxes and return on investment, was in round figures 15 per cent. of its sales, slightly more than half of that considered to be the minimum of expense of actual experiences merchants have encountered in the carrying on of a general merchandise business."

We pretermit the discussion of the issuance of scrip at the store because this practice of the defendant was immediately discontinued upon the first objection made by the government representatives, and will be condemned by this decision.

The experts of the plaintiff testifying upon the basis of their examination of the books kept at the company's store, assert that a profit of $20,997.44 was made by the defendant for the year 1939, and upon certain adjustments made brought the profit down to $20,643.34, the equivalent of 13.8% return on gross sales. The defendant, through its several experts, proved that the company store was actually operated at a loss rather than at this substantial profit.

An examination of plaintiff's exhibit p-23 and of defendant's exhibit D-L, for the year 1939 shows the following items greater on defendant's exhibit than on plaintiff's exhibit in the following amounts, under the head of *direct* expenses: interest on investment, $572.08; depreciation, building, furniture and fixtures, $794.61; property taxes, $238.21; social security taxes, $520.-01; insurance, $325.37; administrative salary, $1,200.00; coupon books, $497.15 (these had been ordered, and though every effort was made to cancel the printing order upon the discontinuance of the issuance of coupons, they had already been printed and had to be accepted by the defendant, though remaining unused). Under the heading of *indirect* expenses, the items of increased cost on defendant's exhibits are: officers' salaries, $2,012.30; office salaries, $1,699.07; office expense, $193.12; interest, $556.42; general expense, $3,584.10. The grand total of increased costs shown by defendant's exhibit D-L over what is shown in plaintiff's exhibit p-23 is $10,392.44.

Then there comes a battle over the next item, which is one for income tax in the sum of $2,264.02. The plaintiff, quite ap-

868

propriately, quotes from Mr. W. B. Lawrence in his book "Cost Accounting", Rev.Ed.1940, p. 182: "Income taxes are not usually considered an expense, but a division of *profits* with the Government, and hence do not affect the cost of operation." And as a supposed clincher, the brief of counsel has: "As a matter of fact, payment of such substantial income tax is proof in and of itself that the store made excessive and illegal profits."

The defendant takes the position, which to it seems incontrovertible, that it must make out a check to the United States government in the sum of $2,264.02 for the income tax and see that it be honored at the bank, and it persists in wanting that item called expense of running the store, *when the point of determining the cost of the goods sold to its laborers be concerned.* The deduction on its bank account prevents any academic conviction to the contrary.

The defendant, through several of its witnesses in executive capacity, has repeatedly said that their operation as a company was always based on the unit of what was the cost of one thousand feet of lumber; that the income tax report was for the company as a whole, covering all of its operations: log cutting, lumber milling, store keeping, renting, etc.; that never before the passage of the Fair Labor Standards Act had defendant analyzed properly the correct distribution of overhead and administrative expense covering its multiple efforts; that the grand total of $10,392.44, shown by defendant's witnesses as expense in addition to that which plaintiff's witnesses allowed, was only discovered and fixed when a real and fair study of the apportionment of such overhead administrative expense became necessary to determine the actual cost of the operation of the store. In short, the position of the defendant is that to insure the good feeling of its laborers, goods were sold at a price less than they could be bought at any other store in Osceola county; that this fact was insurance of the good will of its workers, tending to make them diligent workers and to give them a friendly attitude toward the employing company.

The laborer's housewife, be she white or colored, felt under these circumstances that when she bought her ten yards of calico at the company store she was getting the calico as cheaply, or probably more cheaply, than she could have purchased it at any other store in the neighborhood—proved in this case for the county. Concurrently, her mind must be satisfied because her husband is receiving the minimum wage, or better, in pay, as directed by a beneficent government. She knows that, because he gets it in cash or in deductions from the cash wage which he specifically has authorized. Accordingly, she has a good sentiment towards the employer of her husband. If she had to pay a bare cent more for the calico than she could purchase it anywhere near, she would become a querulous gossip. This accounts for the good service had and the moderately-priced goods offered at the defendant's general store.

The lumber company store that in time established an unenviable reputation was the one of small, ill-selected stock, with poor or no service, and with exorbitant prices. When the store was not unfailingly patronized by the laborer, it meant the laborer's summary discharge. None of these characteristics is found here; it is just the opposite in every respect. Long employment by the defendant company, engaged in an enterprise where labor turnover is generally great, is noteworthy; more than 60% of the employees had worked for over five years, 22% had been with the company for twenty years, and the remainder for less than five years.

What are we to do in a situation such as this? All the witnesses apparently were sincere, of equal intelligence, but we must frankly concede that those of the defendant appeared to have by far the greater experience, and an examination as to their qualification as expert, we believe, will so verify.

We think that the following paragraph taken from plaintiff's brief is a part avowal of the correctness of the position of the defendant in some of the above-discussed particulars: "Admittedly, prior to the trial, defendant had never regarded any additional amount of administrative expense as attributable to the operation of the store. Its main business was the manufacture and sale of lumber, and until this lawsuit was instituted, it apparently felt that the bulk of its overhead expense was incurred for its lumber manufacturing and lumber sales, as indeed is indicated by the very nature of the expenses. A list of the type of expenses comprising the general administrative expense, suffices to demonstrate their remoteness from the operation of the store. (deft. ex. D-L, last page.)"

We must come to the conclusion that the defendant has not violated through its store operations Section 3(m) of the Act, nor the Administrator's Regulation thereunder, previously quoted in full.

The following are additional findings of fact upon which the above conclusion is based:

If the gross profits on sales of merchandise of the company are compared with the merchandising experience of other merchants throughout the United States, it is apparent that its gross profit margin is very much less than that necessary for other merchants to make any money at all —so that unless the costs of its sales were very much less than the goal figures which merchants generally are seeking to achieve in the sale of merchandise, then it would seem inevitable that the company lost money in its sale of merchandise.

In any event, it appears that its net profits on charge sales to company employees could not have exceeded twelve hundred to fourteen hundred dollars in the year 1939, which was the last year in which the company to any appreciable degree sold merchandise on charge accounts to minimum wage employees.

The matter of charge accounts at defendant's store is actually of little importance in this case because the charge sales were largely made to higher wage employees. This was true at all periods of time but particularly so after 1939. In only a few instances, during any period of time, has it been made to appear that the wages of any employee for any particular week would be reduced below the statutory minimum even if it were thought altogether improper to take any store indebtedness at all into account in arriving at balances due for wages.

It clearly appears that all merchandise purchased by defendant's employees was voluntarily purchased by them. This is true as to merchandise bought on charge accounts as well as all other merchandise purchased. Merchandise purchased by employees on charge accounts was so purchased with the understanding and expectation on the part of the employees that the indebtedness thus arising would be charged against the payroll accounts of the particular employees and brought into mutual accountings between employer and employee with respect to wages and such store indebtedness. Balances were struck between employer and employee freely and voluntarily, and without coercion on the part of the employer.

This conclusion does not necessitate the consideration of the question raised by the defendant as to the practical impossibility of determining the results of store operations in advance—as to how the defendant is to prophesy prices, sales, and market fluctuations, so as not to make more than authorized by the Regulation.

Housing Furnished by Defendant.

We must repeat here what appears already as a finding of fact, because it has more bearing, factually and legally, upon the cost of the housing of the laborers than upon any other phase of this case.

As of December 1, 1926, the firm of Coats and Burchard, highly reputed and generally well-accepted appraisers, estimated the J. M. Griffin Lumber Co. plant (mill, machinery, village, etc., excluding all stock of lumber and timber lands) at $1,393,805.37. In this appraisal the record shows that the village houses were estimated to be worth $165,459.65. On February 6, 1934, the present defendant bought the plant from the Griffin company for the paltry and insignificant sum of $82,500.00. It is accepted that by ratio, out of this $82,500.00, the village houses would have to be placed at the sum of $10,065.00.

The plaintiff's position is—and because of our ruling on the validity of Section 3(m) and on the meaning of the words "reasonable cost, as determined by the Administrator", it must be—that this "actual cost" of $10,065.00 must be used as one of the factors in the computation of the rent that may be charged by the defendant-employer to its employees.

However, it is well and fully substantiated in the record that on June 25, 1938, the date that the F. L. S. A. came into effect, the 254 dwellings with their 829 rooms had a fair value in the condition they were of $37,848.00. No one may sincerely dispute that if the law be different from what we have held it to be and that the present fair value of the houses is to be used—and not the amount of $10,065.00—the plaintiff has no case at all on the phase of proving excessive charge to the employees for house rent. Accordingly, we shall finally consider this phase of the case only with the cost value for the houses being placed at $10,065.00.

The defendant made a general charge of $2.00 per room per month over the whole

village, white or colored, and this included the furnishing of water and electricity, without even attempted restriction by meters; or, for three distinct services: housing proper, electric service and water service.

For an indefinite time in the past, the rent per month was $1.25 per room, and was raised to $2.25 for the month of August, 1938, just after the effective date of the Act. Six months thereafter, the rate was reduced to $2.00 per room per month and has been at that rate ever since. This circumstance is pointed to by the plaintiff as indicative of intent to defeat the Act, but we do not give it this significance. We believe that the laborers were paid substantially below the minimum wage in the former days and the rent for the houses accordingly had to be placed below actual cost because the revenue of the laborer could not stand any higher charge for the rent. The laborers could not be starved because they had to perform heavy physical work for the success of the defendant's venture. When the defendant, a corporation, which has, of course, all of the necessary selfishness of capitalistic, competitive organization, was compelled to raise substantially the wages of the laborers to comply with the Fair Labor Standards Act, it then really took inventory of what was the actual cost of not only housing but of every other facility it furnished.

The conclusion reached by the plaintiff's expert witnesses on the one hand differed widely from the conclusions reached by the defendant's witnesses on the other as to the cost of furnishing housing as a whole. They differed substantially as to the cost of the water service, and still more as to the cost of the electric service. To give an illustration, plaintiff's experts estimated the cost of furnishing water at 12¢ per room per month; the expert witnesses for defendant estimated the cost of the water service at 50¢ per room per month.

The final determination by the plaintiff of what it considers a fair and reasonable (perhaps liberal) charge for the housing is $1.40 per room per month. Because of the alleged material differences of housing service afforded the whites and the colored, it claims that a fair division should be had and that for the negro houses the rate per room per month should be $1.10 and for the white houses, $1.70.

An examination by the plaintiff of the rent account kept by the defendant for the three-year period shows a total income from rentals of $71,139.39, and total expenses of $70,233.09, leaving a bare credit balance of $906.30 for three years (pltf. ex. 14). The plaintiff shows however that the expenses listed were for the non-employee buildings as well as for the employee tenant houses, etc., and for church dues, election booths, Chamber of Commerce, etc.

The experts have equally distinguished academic records, but have greatly varying professional experience. They have served fundamentally different interests.

Mr. Smythe, for the plaintiff, is relatively young and has always represented the public interest, as it were, his work since college and university days having been as economist for the Central Statistical Board, as special economist in several federal cases involving the Fair Labor Standards Act, and as a consultant in the revision of Regulation 531 in the month of October, 1940, and as economic advisor at the hearings in the fall of 1941 of regional commerce for the textile industry, as well as for procedure under 3(m) in the same industries; and is at present chief economist for the Bureau of the Budget. He represents distinctly the bureaucratic governmental side.

Mr. Michaels, the chief expert for the defendant, is a much older man with a very broad and varied experience. His educational and professional qualifications are the equal of those of his opponent, but his work has been almost altogether on the side of private enterprise. After his graduation he was first connected with the Cleveland Electric Illuminating Company, Cleveland, Ohio, as one of the engineers in the Survey Division, and then as head of that Division; for the next two years he was the Emergency Superintendent for that company, and his duties covered anything of an emergency nature that might occur outside the current operating practice; at that time he had eight employees under him regularly, and in emergencies that number would be built up to sometimes as many as one hundred and twenty-five men; after two years of service in charge of that operation he was transferred back to the Survey Division for the purpose of taking responsibility for the design, supervision and construction of approximately three and a half million dollars worth of

underground conduits and cable installations in the city of Cleveland; he was engaged in that particular work approximately a year; he resigned his position with this company for the purpose of going into the practice of private engineering, with offices in the city of Cleveland, and continued in private engineering for approximately 14 months, at which time he was offered the position of Chief Appraisal Engineer and Rate Expert for the Public Utility Commission of Ohio in the Electric Light, Power and Street Railway Subdivision; during his connection with the Public Utility Commission of Ohio he had the responsibility for the appraisals and rate studies on most of the large cities in the state, including Cleveland, Columbus and Cincinnati; after approximately five and a half years he resigned his position with the State to accept responsibility for the construction of a large steam generating plant in Cleveland, costing approximately $3,500,000; in the early part of 1919, after the completion of the power plant, he became connected with the W. S. Barstow Management Association which managed a large group of properties throughout the eastern United States, and his principal activity was making appraisals and rate studies and handling matters before the Public Utility Commissions in the various states; after several years' connection with this Association he was appointed General Manager and Chief Engineer of the Orlando Utilities Commission, a municipally owned plant operated by the Utilities Commission of the City of Orlando, Florida; during his time there he was in charge of all of the operations and engineering of every nature, the establishment of rates, studies of costs, making of contracts, and all of the various functions that are usually performed by such a utility; resigning in 1932, at the end of nine years' responsibility in that capacity, he opened a practice of private engineering in the City of Orlando, and since that time has made appraisals on approximately two hundred million dollars worth of property located in the State of Florida.

The two or three other expert witnesses on each side classified similarly. The court is in between.

### Cost of Furnishing Water to Defendant's Employees.

The plaintiff says that the difference in the cost of housing as proved in the case is attributable entirely to the difference in costs presented in the case of furnishing electricity, apparently ignoring the fundamental difference as afore-mentioned in the furnishing of water. (See brief of plaintiff at p. 65: " * * * the discrepancy between the plaintiff's and defendant's calculations is traceable primarily to the difference in their estimates in the cost of furnishing electric lights * * *.")

Plaintiff's expert witness Seymour said: "I did not have anything to do with the water system so far as determining the cost of supplying water * * *." (R. 263); "My calculations * * * related to the electric operations of the plant, and, as a matter of fact, to the extent that water expense is included in the light and water expense * * *." (R. 251) Finally, witness Smythe took this position, as the record at p. 601 shows: "Q. Then so far as all of the testimony you have given here is concerned it is based wholly upon the testimony and compilations made by Mr. Seymour and Mr. Gimson? A. As far as the electric and water systems are concerned, yes." But plaintiff's witness Gimson (the third and last one) was the one who stated, at p. 469 of the record: "I do not know anything about water and power." Mr. Seymour said, at p. 252 of the record: "What I meant to say was that my figures showed a total charge of thirty-six cents per month per room for electric service, and included in that is power account of light and water expense which is allocable to the light and water service, and which is allocated to the town distribution system, because I made no deduction for water expense allocable to the water plant."

Mr. Gimson said, at p. 469 of the record, that he "simply relied on a cost per cent basis." Then, in answer to the query as to what he meant by "cost per cent basis", he testified: "Q. With respect to the water system, on what did you predicate your views as to the costs on that? Can you show me any formula that you used in connection with that? A. No, I cannot. Q. Then isn't it true that substantially the only thing you did in that determination was to take certain accounts of the company and make certain reallocations? A. I took the water and light expense account and figured from the face of the account a certain per cent which I considered allocable to the town." (R. 468, 469)

Counsel for plaintiff assert in their brief that 46% of the light and water expense account was allocated by Mr. Gimson to the rent account. This statement, we are sure, is made in reliance upon Mr. Gimson's testimony (R. 412): "In regard to the light and water account, we used forty-six per cent of the total amount of water expense and allocated it to the dwelling properties, * * *." It seems to us, however, that in preparing plaintiff's Exhibit 15 Gimson did not allocate 46% of the light and water expense account (Plaintiff exhibit 10) to the rent account, for there he allocated only 29.4%. We make that deduction because the amount of $2,737.11 (Plaintiff exhibit 15) is only 29.4% of $9,297.25. This latter sum is the addition of the item shown on the light and water expense account (Plaintiff exhibit 10) for the period of time of three years, Nov. 1, 1938, to October 31, 1941— the same period of time covered in Plaintiff exhibit 15 where the amount of $2,737.11 is first taken. If Mr. Gimson had actually used the percentage of 46% he would have allocated to the rent account the amount of $4,276.73 instead of the amount of $2,737.11.

The books of the defendant allocate to the rent account (Plaintiff exhibit 7) what amounts in the aggregate to 68.8% of the light and water expense account for the same three-year period. Defendant's books of course are prima facie correct. West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 68, 55 S.Ct. 316, 319, 79 L.Ed. 761, 767. Mr. Michael's statement is more in consonance with what defendant's books show; we find no basis to support Mr. Gimson when he left out a portion of the account as charged by the defendant on its books.

Mr. Gimson gives two reasons for his leaving out most of the light and water expense account as found on the books to be credited to the rent account: first, that he "noticed in 1941 the percentage which the company decided to charge to the rent account was very close to the percentage which I used myself for the previous period." (R. 469); and second, that Cepeda stated "in his testimony that 75% of the repair and maintenance at the mill—75% of the labor maintenance was chargeable to the mill and only 25% to the dwelling properties." (R. 412) We do not believe this first reason to be sound in principle nor do we find it supported as a fact in the

record. The percentage of the water and light expense account actually allocated by Gimson (29.4%) was not anywhere near the percentage used by the defendant in any month in 1941; in fact, was little more than one-half of any such percentage. We do not find the second reason either to be supported as a fact in the record. Mr. Cepeda was not asked about the light and water expense account, nor was he asked about electrical and water repair work in general, and he was not asked about any of the electrical repair work other than what he himself did. We quote from his deposition (Ptf. dep. 614): "Q. Do you know about how much of your repair and maintenance work is done on the mill as compared to the town? A. Most of the work is in the mill. * * * Q. Could you estimate about what percentage of the work is on the mill and what percentage is on the town? A. Oh, I would say maybe about seventy-five per cent. Twenty-five per cent on the town."

At p. 1678 of the record Mr. Michaels testified that Cepeda's time was not charged to the light and water expense account.

Mr. Gimson seems to be the expert witness on whom plaintiff solely relied to establish the reasonable cost to defendant of furnishing its employees with water service, but he did say himself: "I do not know anything about water and power" (R. p. 469); that he "simply relied on a cost per cent basis." (R. p. 468, 469)

The court agrees with the following conclusions found in defendant's brief:

"Gimson made no allowance whatever for any costs in connection with pumping the water—no allowance either for operating expenses or for fixed charges. Mr. Michaels found that $1,727.76 annually of the power house operating expenses (in addition to a proper amount of supervision charges) were directly chargeable to the pumping of the water (Table No. 9 of Deft. Ex. E). He also found that of the total fixed charges (depreciation and return on value of investment) on the steam production equipment, 13% was properly chargeable to the pumping of the water (Table No. 8 of Deft. Ex. E). In fixed charges only, the pumping of the water costs $2,174.21 annually. The two items in connection with the pumping of the water (operating expenses and fixed charges) total $3,901.97 per annum or 55.7% of what defendant's witness Michaels found to be

the total annual cost to defendant of furnishing the village with water service. In other words the two items of cost which together constitute 55.7% of the total cost are entirely omitted by Gimson in his calculations.

"Gimson makes no allowance whatever for any cost of supervision, bookkeeping or general administrative expense. Michaels finds that supervision expense chargeable to the cost of furnishing water service amounted to $278.61 per annum (Table No. 9 of Deft. Ex. E).

"Gimson made an arbitrary and grossly inadequate apportionment of the light and water expense account to the cost of furnishing electric service and the cost of furnishing water service. * * * he apportioned only 29.4% of the light and water expense account to electric and water service. Michaels found that a considerably larger amount should be apportioned (Table No. 9 of Deft. Ex. E)."

The testimony of Mr. Michaels on the point of what was the cost of water service per room to the defendant is much better premised, and though we are not reflecting on the sincerity of purpose of the government witness at all, we believe that when he established the water service at 50¢ per room per month it was the true and correct estimate.

### Cost of Furnishing Electricity to Defendant's Employees.

In establishing the cost of furnishing electricity to the rented houses we believe that the government relied too much on the evidence of Mr. Cepeda, the superintendent of the power plant for the defendant. Mr. Cepeda is Spanish, and English is not his native tongue; his deposition discloses rather confused and uncertain testimony. Much of the source of difference on electric costs originates in the fact that the power plant furnishes power to the mill machinery on the one hand and to this village of over 270 houses on the other; from the fact that the mill, since its purchase by the present owners, does not run at night, though has numerous lights burning on the premises, and that the village uses its electricity principally at night, the village service being then clearly responsible for a 24-hour service; from the fact that different generators, small and large, have to be used or shut down at various periods of the day and there is much room for the exercise of legitimate opinion as to the whys and wherefores.

Since the estimate by the government experts rests primarily on assumptions based upon Cepeda's testimony, and Mr. Michaels, the power expert for the defendant, makes practically no use of Cepeda's testimony (except in instances to be noted further), but studies the question purely from the scientific viewpoint of the electrical engineer, as he found it from direct, personal study and observation, we believe that a detailed consideration might be made of Cepeda's testimony so as to discover whether or not it be inconsistent. After checking, we have decided to use verbatim the inaccuracies brought out by counsel for defendant in brief:

"1. At page 589 he states that the 1000-KW generator is operated on Saturday. Two pages over he states that the 1000-KW generator is not operated on Saturday (Ptf. Dep. 591).

"2. At page 616, he states that the small generator that is operated throughout the night is the 85-KW unit. At page 605 he states that it is the 75-KW unit, that when one of the machines is shut down 'the new machine takes the full load;' the 'new machine' is, of course, the 75-KW unit and not the 85-KW unit.

"3. At page 582 he states that the 75-KW unit was put in 'about three years ago' (that is, about three years prior to November 26, 1941, the date of his testimony); at page 1282 he says that the 75 machine was installed 'about two years after the first one;' the first one was installed in 1934 or 1935; at page 1295 he says that the seventy-five was installed in 1937 or 1938; actually it was installed in March, 1940 (Ptf. Ex. 8, invoice dated 2/29/40).

"4. At page 584 he states that the length of time the big generator has been in operation for the period from six o'clock in the morning to five o'clock in the evening is 'A couple of months. I can't tell you exactly.' At page 585 he indicates that the length of time since the machine was running longer than from six a. m. to five p. m. has been 'A year or so;' 'Maybe not quite that far back.'

"5. At page 588 he states that the load on the big generator, which is operated during the daytime, is three hundred amperes as indicated on five different meters. When

he attempts to add up the parts that are supposed to make up that total, they do not total that at all. At pages 586 and 589 he gives a guess on the readings on each one of the five meters. His guesses when added together aggregate far short of three hundred amperes; in fact they total less than three-fourths of that amount.

"6. The statements of Cepeda as to the normal capacity in amperes of the 85-KW generator are of an extremely dubious and indecisive character. At page 604 he indicates that the full capacity of the machine is 24 amperes. At page 1277 he refers to its capacity as 'about 28 or 25'. At page 1278 he says that 25 is its total amperage. He then goes on to explain: 'She can carry about 32, safe, for a few hours.'

"7. As to the boilers, he says at page 1264 that the pressure is 'supposed to be 130 pounds;' that there are two of the boilers that are cut down; 'The two of those cut down for use of pumps and kilns;' at page 1265 he says as to pressure of those two 'I think one, 120, and the other is 130. 140.' At page 1284 he says: 'One is about 110 or 120 * * * and the difference is not quite ten pounds—not quite 20 pounds. One is 135 and the other is about 115 or 120. It is about 15 or 20 pounds.'

"Many other inconsistencies could be pointed out. Actually all figures mentioned by Mr. Cepeda were, as he readily agreed (Ptf. Dep. 1291), mere guesses; he had made no attempt to check anything, was not testifying from any records or from any study made, and his testimony as an exact and precise factual basis for any dependable conclusion is obviously utterly unreliable. The Government admits it made no request on Mr. Cepeda to check anything before testifying (R. 526). * * * If Mr. Cepeda had made actual readings and had brought that record into court and had been interrogated in regard thereto in his native tongue, the situation would have been * * * different. * * *"

The basic conflict sought to be proved by plaintiff between the testimony of Michaels and the tesimony of Cepeda, we believe fails for two reasons: first, the village load curve in Michaels' report is not correctly given in plaintiff's brief as the village load curve does not show a "160 KVA peak" as stated by counsel, but instead a daytime peak at eleven o'clock in the morning of 150 KVA and a nighttime peak (which is the peak with which Cepeda was dealing in his testimony to which plaintiff refers) of only 130 KVA; and, second, a reference to pages 604 and 605 of Cepeda's testimony is unfair without at the same time referring to pages 1277 and 1278 of his testimony. We quote anew the language of defendant's counsel:

" * * * A reference to the latter pages shows that the only feature of the testimony on pages 604 and 605 that is of any significance is the unquestionable certainty in Cepeda's mind (whatever else might be uncertain) that the 85-KW machine was badly needed to its full capacity for the town alone for the evening hours. Reference to page 1278 shows that he felt sure the town load often got up to 32 amperes. The actual rated capacity in amperes of the 85-KW machine can be very easily computed by first translating the kilowatt capacity into kilovolt ampere capacity and then computing the amperage on the basis of the kilovolt ampere capacity. The kilowatt power is the external or output power in the machine while the kilovolt ampere power is the internal power of the machine; an external capacity of 1000-KW is equivalent to an internal capacity of 1250 kilovolt amperes (Ptf. Dep. 1281). The 85-KW unit has an internal capacity of 106.25 KVA, i.e., 25% more than its external capacity of 85 kilowatts. If the amperage capacity is computed on a machine of 106-1/4 KVA capacity (using the very formula suggested by counsel for plaintiff at page 72 of their brief) it will be found that the normal amperage capacity of the 85-KW machine is 27.9 amperes (not far wrong from 28, one of the figures mentioned by Cepeda at page 1277). The 130 KVA nighttime peak in the load curve of Michaels when translated into amperes would be 34.1 amperes. Cepeda himself says that the 'machine can carry 20% overload for a few hours' (Ptf. Dep. 1278). So when analyzed, the figure of 34.1 amperes used by Michaels (when considered in connection with the actual 'normal' capacity of the machine of 27.9 amperes) is not very far different from the figure of 32 amperes mentioned by Cepeda at page 1278 at a time when he was thinking in terms of a probable normal capacity of the machine of 25 amperes. Certainly the variance between the figure mentioned by Cepeda and the figure actually observed and recorded by Michaels, 'not merely guess work but precise engineering calculations' (R. 1632), is no greater than would natu-

rally be expected between a mere guess (Dft. Dep. 1291) and an actual observation.

"In making the calculation of 12½% of power house expenses to village electric Gimson and Seymour depended entirely upon the testimony of Cepeda. In Sheet 2 of plaintiff's Exhibit 16 they definitely misrepresent any possible interpretation of Cepeda's testimony. For example, the figure of 220 as the meter reading for the mill for daylight operations is supposedly a mere addition of figures shown on four different meters as set out at pages 588 and 589 of the deposition of Cepeda. Actually the correct addition is not 220 at all but is only 200 (the 200 being arrived at by adding the reading of 120 amperes on the two sawmill meters, the reading of 70 amperes on the planer mill meter and the reading of 10 amperes on the sizer). There are many other misrepresentations of the purport of Cepeda's testimony in Sheet 2 of plaintiff's Exhibit 16. We suggest a careful item by item comparison of Cepeda's entire testimony with Sheet 2 and we feel sure the Court will be convinced that the tabulation referred to is utterly unreliable as a portrayal of the effect of Cepeda's testimony."

In plaintiff's exhibit 16, sheet 2, Mr. Seymour, one of the plaintiff's experts, using Mr. Cepeda's reading, placed the ampere reading of the town meter at 2:00 p. m. at 16 amperes (Record 189). On cross examination, he admitted that when he read it himself it was really 24 amperes (Record 193). The reading on Mr. Michaels' chart at 2:00 p. m. was slightly above 100 KVA which, translated into amperes, approximates 24, and not 16, amperes.

The court was impressed with the fact that Mr. Michaels' evidence on the subject of power was more accurately representative of what really existed, being the result of an investigative undertaking based on past experience and high electrical engineering skill, not dominated, nor even hampered, by preconceived notions or ideas of the local superintendent. This we think was strongly brought out when Mr. Michaels testified that out of the 1,394,354 pounds of steam used in all of the defendant's operations at Holopaw, only 210,960 pounds were used in the generation of electricity, with 1,000,894 pounds being used directly in manufacturing operations and 182,500 pounds directly used in water pumping for the village (Record 1614). Mr. Michaels, we believe, gave adequate weight to all of these factors in his careful and informed analysis of costs. The converse of this really correct appreciation of the power situation at this plant was, we believe, shown when plaintiff's witnesses apparently thought it meant much to show their discovery that two of the boilers were not used exclusively for the generation of electricity but had been "cut down for use of pumps and kilns" (Ptf. Dep. 1264; R. 209); and while they were used regularly for the generation of electricity (R. 611, 1264–1266), were also used for these other purposes. The fact is that none of the eight boilers is used exclusively for the generation of electricity.

At this juncture plaintiff's witnesses, not knowing that the other six boilers were also not used exclusively for the generation of electricity, threw out the two boilers entirely in their computations and then allocated all of the cost of operating the six boilers, overlooking in fact what was really the composite situation existing.

We believe that Mr. Michaels had a more accurate and comprehensive view of the situation than the experts Seymour and Gimson—the expert Seymour with less experience than Mr. Michaels and expert Gimson who was in the main a professional bookkeeper or accountant.

There was no allowance made for fuel in connection with the production equipment (R. 210), nor was any allowance made for fixed charges on the fuel house (R. 221). The only proportionate allowance by plaintiff out of the $82,500.00 purchase price in 1934 was for the "power house" and the "power plant". All of the "power properties" were not included (R. 227, 228). The appraisal of Coats & Burchard shows two boiler houses (Buildings 1 and 4 on Plaintiff's Exhibit 13). The power house is Building No. 2 on plaintiff's exhibit 13. The percentage that these three buildings, appraised at the total of $118,283.92, bears to the total of defendant's property, $1,357,790.37, is approximately 8.7%. This is the percentage reached by the witnesses of plaintiff. But, giving no reason for it, plaintiff's witnesses left out, in arriving at this percentage, the fuel house or shavings vault, the latter being Building No. 3, valued at $11,272.36 on the appraisal (Ptf. Ex. 13). Obviously, the omission of the value of this building in the figures used in computing the proportion of the total purchase price of $82,500.00 materially increased the percentage, with

the consequent result of raising the costs found by the witnesses of plaintiff.

Is the production of electricity at Holopaw primarily for the mill and not for the village? Of course the 1,000 KW generator produces electricity during the time that the mill is running primarily for the mill, and only to a minor, although substantial degree, for the village, but it is clear that during the time the mill is not in operation, which is thirteen hours out of twenty-four every day, and for the twenty-four hours of Saturdays, Sundays and holidays, the generation of electricity is primarily for the benefit of the village electric system and not for the mill. When the defendant acquired the property it did not operate the mill at night, as formerly was done, and an 85 KW unit was acquired especially for the purpose of supplying electricity to the village (Ptf. Dep. 582, 1282).

Cepeda is quite clear, though we believe much in error, in one part of his testimony, and that is that the 75 KW unit is never at any time more than half loaded (Ptf. Dep. 616, 592, 596, 602, 1277), while the 85 KW unit is fully loaded during all the evening hours (Ptf. Dep. 602, 604, 1277; compare page 4 of Dft. Ex. E.). The 85 KW unit is used solely for the village until the 75 KW unit is shut down (Ptf. Dep. 604, 605). While Cepeda was not sure on specific figures or dates, he was definitely sure that the village load was more than twice the mill load during the evening hours. This method of allocation was of course used by the plaintiff.

The unfairness of such method of allocation is indicated by Mr. Michaels in the following language: (R. 1643, 1644) "They have allocated on the basis of kilowatt hours. Now, the kilowatt hour has the element of time involved in it as to how much you use your power—how many hours, if you use kilowatt hours. I merely use my example to indicate that the kilowatt hour is not the proper method to be used in allocation. Under the method he used here, he would allocate a great many more kilowatt hours to the operation of the mill under that theory, but erroneously. Now, you operate your mill ten or ten and a half hours a day. The other thirteen or fourteen hours, which are expenses directly chargeable to the furnishing of the electricity to the village is not reflected in that spread at all."

There were four different factors in the labor cost of power house operation: first, labor in connection with the big generator while the mill is operating; second, labor in connection with the boiler room while the big generator is being operated; third, labor in connection with the small generators while the big generator is not in use; and, fourth, labor in connection with the boiler room while the small generators (one or both) are being operated and the big generator is not in use at all. A careful analysis and weighing of these four factors were made by Mr. Michaels; no such refinement is presented by the plaintiff. Finally, and in conclusion, though Mr. Seymour for the plaintiff concedes that taxes (R. 259), insurance (R. 268, 269), administrative costs and general office expenses (R. 267) are proper elements of cost in determining the cost of furnishing electricity, such items are not allowed by the plaintiff (Ptf. Ex. 15). Seymour evidently did not take the factors of administrative expense or overhead into consideration, but in explanation suggests that he "made allowances to offset any charges that might be made in that regard" (R. 478).

Though there be wide disparity between plaintiff and defendant on the cost of furnishing electricity to the village houses at Holopaw, this difference in result is not due to the difference in the percentage used in allocating the equipment needed and used for producing the electricity for both the village and the mill. Plaintiff's witnesses proposed an allocation to village electricity of 12½% of the power house equipment facilities, including the steam production equipment; the defendant, through Michaels, used a much smaller percentage, only 9.4% of the power house facility and steam production equipment in ascertaining the property attributable to production of electricity for the village.

The defendant has sincerely taken the position that it has been fair and reasonable in arriving at its figures with respect to fixed charges and operating expenses, the two general classes of costs in the furnishing of electricity by the defendant to its employees, alleging that it has left out of its calculations a number of items of cost which could well be fully recognized as proper (R. 1609, 1610, 1641, 1647, 1648, 1763), and which, if included would have materially increased the costs.

It would seem to us that plaintiff's case on electric and water costs was not strong. Mr. Smythe though otherwise highly qualified, said he did not have anything to do with determining the figures of water cost or electric cost, but that he was basing his testimony wholly on the testimony and computations made by Messrs. Seymour and Gimson (R. 601). Mr. Seymour said he had nothing whatever to do with determining the cost of supplying water (R. 263, 251). Mr. Gimson, as previously quoted, said: "I don't know anything about water and power." (R. 469). Mr. Seymour is without engineering training or practical operating experience, with more of a scholastic than an engineering background (R. 166, 181, 182), and spent altogether but four hours at Holopaw—three hours at one time and one hour at another (R. 169, 189); and finally, as previously noted, Messrs. Seymour and Gimson in the main anchor their conclusions on what we think is a rather unstable and dubious support— the testimony of Cepeda.

The main witness on engineering costs by the defendant, to all appearances one of the best qualified men in his field in the United States, spent 21 days on the property studying every feature of the operation, taking stock of the property, making readings in person, and generally attending during that period to the regular 24-hour operations of the power plant. Weeks were then spent in studying, assembling, and arriving at the conclusions offered to the court.

The court must accept the evidence of Mr. Michaels and declare that it preponderantly supports and proves the correctness of 92¢ per room per month as being the cost of furnishing electricity to defendant's employees.

## Total Cost of Housing Furnished by Defendant.

Having now considered and ruled upon two of the main factors which are to be used in arriving at estimating the cost of housing, to-wit: cost of the water service and the cost of the electricity, we are now to consider the total cost of housing, and let the other necessary factors enter.

We are not without realizing that the previous estimates, both as to water and electricity, were predicated upon the present value of the property entering into the production of the utility, evolved from a cost of reproduction new less depreciation.

We are not without realizing that, because of our ruling on the legal effect and meaning of Section 3(m), we must arrive at the value of these two factors, as well as the aggregate cost of the housing, based upon the properties entering into the cost of the housing, on an actual cost basis; that is, the part of the total purchase price of $82,500.00 represented by the village houses.

To arrive at the cost of the buildings, there is to enter the erratic and complicated computation of the following annual repairs to the properties from the purchase in the year 1934 by the present owners, as well as the addition intermittently during the subsequent years of a number of new houses. We should remember that on February 6, 1934, the defendant bought the mill and its equipment, including the then-existing water and electricity production and distribution systems, and the dwellings, at a total cost of $82,500.00. Immediately after the purchase, a number of the dwelling houses were taken down, with some of the lumber being salvaged, so that of the original number of white dwellings there were left 63, with a total of 301 rooms, and of the negro dwellings, 149, with a total of 396 rooms. The expense by the new company, the present defendant, immediately after the purchase on the dwellings was something in excess of $14,000.00 (Def. Ex. X, p. 1; Def. Ex. M, p. 3). From defendant Exhibit X, p. 1, we ascertain that the cost of the rehabilitation of houses, the ditching of the town, the wiring for electricity, the cleaning of the town, and the completion of two new 2-room houses, amounted to something more than $16,000.00.

And so, from year to year, the repair has been constant and additional houses have been constructed, so that as of December 31, 1941, there were 81 white dwelling houses with a total of 389 rooms and 190 negro houses with a total of 534 rooms, and for which rent was collected. The boarding houses and the hotels are not included. No account is made for and no rent collected from rooms which have been added to the dwellings by employees themselves with the lumber furnished without cost by the company, nor for garages, and such, constructed by the tenants with free lumber. These dwellings are of the type generally to be found in the large sawmill communities throughout the southern United States.

For the purposes of this opinion, since we have to be controlled by costs alone, we shall not go into the detailed description of the type of construction of these houses. An average house drawn from the photographs furnished by each side would be about correct. All houses have tongue and groove flooring and are ceiled. Some of the older houses were ceiled on the top side of the ceiling joints, which of course makes them not as attractive and will explain why some of the witnesses testified that they were not ceiled at all. The houses were never painted, which of course takes very much from their appearance. An example of proletarianism came into the case when the residence of Mr. D. L. Handley, longtime manager and now president of the defendant company, was also shown never to have been painted, though his wife and children lived there.

The two sets of photographs filed in evidence by the two contestants display the acuteness of the litigation. The photographs of the plaintiff do not lack in truthfulness; they lack in applicability; therefore they lack in fairness. What we mean here is proved by two observations: (a) when photographs are made of the lean-tos, built by the renter as shelter for his automobile or to serve as a wash shed, etc., as an addition to his house, with lumber furnished free of charge by the mill, for which lumber he is never to be asked payment, nor is he to be charged rent of the lean-to, provided he makes his own construction, and these photographs filed in evidence as representative of the condition of the rented houses; and (b) when photographs are taken of the very worst buildings of the several hundred, to the exclusion of others in the same class, and offered as representative of the condition of the whole village.

At the same time the defendant is not without sin here because it is evident that the photographs of the very best buildings were taken and filed in its behalf as examples of the whole.

The company maintains a repair crew of five or more, under a foreman. This crew is kept constantly busy repairing the houses and building an occasional new house. Requests for repair are answered in the order of their being made, irrespective of race. The evidence and the photographs prove that there was much variance in the manner in which the homes and places of the laborers were kept, and there are to be found some neat-appearing houses among the negro tenants as well as among the white tenants. The county road department of Osceola County takes care of the streets in both the white and the negro communities.

There has been a large record made from the examination of the tenants in the village of Holopaw, and among the great number examined we must say that there are at least a dozen who speak quite disparagingly of the attention they received in the way of improvement to or repair of their houses, even after request had been filed. It is to be noticed that among these is one, Bradley, who at one or the other time had owned five different automobiles (Ptf. witness Bradley, Dep. 491), yet was $60.00 behind with his rent (Ptf. dep. 484). He had not paid his rent in months and he was doing nothing whatsoever about his home (Ptf. dep. 478, 479). Another chronic complainant was Smith, and he was $56.00 behind in his rent (Ptf. dep. 476). One George Rivers said he did not want to pay any rent (Ptf. dep. 47) and in fact had not paid any rent for some time (Ptf. dep. 410), and was $44.00 in arrears. The house of Austin West, admittedly the worst house in the community, having been a former pressing shop, was being rented at $1.00 per room per month. It had not been built for a house and the price was just half of the regular price. Much had been added as a lean-to to this house with free lumber.

And we could go on in like tenor with most of the complaints. Generally speaking, the most indifferent and irresponsible employees in the village occupied the houses that were in the worst condition.

On the other hand, quite a number of plaintiff's witnesses testified that their houses were in good condition and that the property had been regularly repaired: Melvin Davis, negro (Ptf. dep. 150); Sam Jones, negro (Ptf. dep. 561). Sam Jones, in particular, testified as follows: "A. Yes, sir. Every time I went to him for anything to fix my house, he come right on and fix it. Q. You never had any trouble about that at all? A. No, sir, never have. Q. The outside of the house, privy or anything else? A. Yes, sir." (Ptf. dep. 564) It is Sam Jones' house, by the way, which is the subject of one of the photographs of plaintiff taken from the inside of the room under time exposure and shows much

light coming through the cracks of the wall. The record fully establishes that this was a room added to his house by Sam Jones with free lumber, and on which he paid no rent.

We believe the testimony of the numerous employees, white and colored, shows a regular and immediate attention to repairs when requested.

Though this remark has nothing to do with the facts nor with the law of this case, it has not been so many decades past that all of the woods laborers would not have been living in a village with such fairly good conditions, with light and water, but would have actually been living in the woods, with portable camps, where conditions were really very poor. The location of the laborers now in company villages, besides bringing many advantages which may be noted from what has already been said in this case, tends to make everyone more sociable, gives the opportunity of schooling, of church-going, of attending picture shows, etc., and affords facility for nursing, medical attendance and hospitalization.

We must be frank and say that we have not been impressed by any proof in this record that there was discrimination between the white and colored people employed. This is true not only as to the rental situation, which we are now considering, but is likewise true generally as to all the phases of this case. Negro labor is the basic labor in the exploitation of the timber resources of the south, and for this economic fact, if no other, the negro laborers are well treated and good care is given them. The day has gone when the laborer, white or black, is unable to protect himself.

This case is rehearsive of all points that might arise in the application of the F.L. S.A. in the operation of a typical southern pine sawmill in the southeast of the United States. The fruits or the results of this case should be uplifting of conditions. However, the minimum wage is, to begin with, so low that social reformers are prone to expect too much improvement in living conditions from its application. In the instant case, when necessarily the facilities furnished must be in proportion to the ability of the laborer to pay, the house-rent charge of $2.00, let us say, per month per room to the laborers, when lights and water are included, should not permit the expectation of much in the way of elaborate appointments. The minimum wage should be higher in order that better standards of living be attained.

Quite an issue was drawn in this case as to the appropriateness of the defendant's apportionment of overhead expenses in arriving at what was the actual cost of the rent of the village houses. In the composite venture of the defendant, not only involving what was its main business, the exploitation of the forest and then the manufacturing of the felled tree into sawn and usable lumber, we find it engaged in general merchandising, house renting, etc. It was actually admitted that overhead expenses were allowable on any and all phases of defendant's venture, but there was much debate as to the proportionate allocation of these overhead expenses to the various phases of the venture. We think it would be impossible for every individual item going to make up the cost of an overhead to be followed through directly to its eventual fixed point of expenditure. We believe the courts have recognized the principle of percentage allocation in order to circumvent what would be an impossible and interminable procedure. Southwestern Bell Telephone Co. v. City of San Antonio, 5 Cir., 75 F.2d 880, 885; Guggenheim v. Helvering, 2 Cir., 117 F.2d 469, 474; Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 403, 60 S.Ct. 681, 84 L.Ed. 825.

We must repeat that the books of defendant previous to the application of the minimum wage and maximum hour law in its venture did not reflect the refinements of divided allocations to its various activities. It is not a condemnation of the defendant because of its having allocated the overhead expenditure at the time of trial of this case, nor is it to serve as a basis of attack on the worth and credibility of the present evidence of allocation.

On the basis of cost of reproduction new less depreciation, the defendant has shown that the actual cost of furnishing light and water per room per month is $1.42 (Dft. Ex. E, table 13).

The court was well impressed with the qualifications of Mr. C. Walton Rex as an expert to give evidence as to the estimated cost of the rental value of the houses, using the factors of water and lights ($1.42) developed by Mr. Michaels, the electrical engineer. He shows that the defendant, using present value in the determination, lost in the course of three years a sum in excess of $40,000.00. As to the conservativeness

of his computations and entire statement, he said: "Yes, that would be the practice anyone who owned that property would have to follow and that would be the cost it would be to him if he followed just good sensible business practices as applied to real estate." (R. 1699)

We believe that the defendant undoubtedly is losing money on the housing when the cost reproduction new, less depreciation, is used.

### Cost of Housing—Using the Sum of $10,065.00 as the "Actual Cost to the Employer" (Sec. 531.1) of the Village Houses.

All of the above conclusions are of meager worth in the decision of this case because we have ruled previously in this opinion as a matter of law that it is the actual cost of the rent based upon the purchase by the defendant of his sawmill plant at the rather trivial sum of $82,500.00 that is to be used in fixing the rental of the houses to the employees—not the value at the time of the passage of the Act.

Mr. Rex based his allocations for lights and water upon the computation of the cost of these as made by Mr. Michaels, electrical engineer. The cost of lights and water per room per month was fixed, using the $82,500.00 purchase price, by Mr. Michaels, at 82¢ per room per month (Dft. Ex. E-1). It will be recalled that this figure under the other hypothesis was $1.42. Mr. Rex, taking the 82¢ per room per month as the cost of lights and water, and apportioning to the cost of the dwellings 12.2% of $82,500.00 ($10,065.00), came to the conclusion that the defendant still suffered a loss during the run of the three years at issue. (See Dft. Ex. X).

Mr. Rex's finding was in corroboration of what Mr. Melton found to be in the same premises (Dft. Ex. M). To illustrate Mr. Rex's computation (See R. 1789, 1790), for the year 1939 (Dft. Ex. X, p. 5), we show the following, which exemplifies that the defendant lost the sum of $1,605.97 in its operation of renting:

| | | |
|---|---|---|
| To begin with, he figures the total collectible rent at | $22,104.00 | |
| Here, as in defendant's Exhibit O, page 22, he makes the same allowance for vacancy and rent loss, namely, ten per cent. | 2,210.40 | |
| And arrives at the same amount of collectible income, namely | | $19,893.60 |

| | |
|---|---|
| In both exhibits, he shows, and for the same reason, the cost of collection of rent and clerical at 5% | $ 994.68 |
| He takes the cost of repairs and maintenance from the company's records in the amount of | 3,987.75 |
| The figure on insurance is on the depreciated value of $38,242.82 at $1.50 per hundred | 585.18 |
| Cost of lights and water is on the figure furnished by electrical engineer Michaels at cost | 8,952.12 |
| The return on the investment is figured at 5½% on the depreciated value of | 2,103.30 |
| The depreciation for year 1939 based on the use life of the property is | 4,315.82 |
| The taxes for the year 1939 are the same as at page 22 of defendant's Exhibit O, namely | 318.63 |
| Social Security for 1939 is likewise the same, and at cost | 242.09 |
| Making the total expenses for the year 1939 | $21,499.57 |
| And the loss, making no allowance whatsoever for the actual value of the property on June 25, 1938, is | $ 1,605.97 |

It not necessary to illustrate similarly for the years 1940 and 1941, in which latter two years the Rex computation on the second hypothesis shows the respective losses of $5,939.29 and $5,797.87.

Mr. Rex and Mr. Melton testified that they made their estimates independently of each other. For the period involved, namely, from November 1, 1938, to and including October 31, 1941, Mr. Melton shows that if recourse is had to cost figures only of capital assets the company lost $12,963.19 in furnishing lights, water and dwellings to the employees (Dft. Ex. M-1). Mr. Rex in figuring the losses at cost on his alternative basis of computation covers the calendar years 1938, 1939, 1940 and 1941 (see last four pages of defendant's Ex. X), and he shows a loss through ownership of the property during such period of $21,172.60. In the year 1939 there was extensive building in that the company added five four-room houses, twenty-two three-room houses, and eleven single rooms, or a total of 27 houses or 97 rooms. Consequently, repairs were then deferred on the unrepaired buildings. But if we compare the period of time involved there is very slight difference between the losses as calculated by Mr. Rex in his Exhibit X, and Mr. Melton. If in Mr. Rex's figures we take one-sixth of the loss for the year 1938 and compute the loss for two months, we have (Dft. Ex. X, p. 4):

Loss through ownership for 1938 (two months) $1,304.90

Loss through ownership in 1939 (Dft. Ex. X, p. 5) 1,605.97

Loss through ownership for 1940 (Dft. Ex. X, p. 6) 5,939.29

Loss through ownership for 1941 (Dft. Ex. X, p. 7), $5,797.87, and if we take ten-twelfths of that figure, we place him on the same basis as Mr. Melton 4,831.50

Making a total of $13,681.66

Mr. Rex's computation thereby being $718.47 greater than Mr. Melton's.

█ So, in final conclusion, on the question of the cost to defendant of furnishing housing involving the factors of power house charge, light and water expense, depreciation, overhead expense, insurance, and taxes, the evidence preponderantly establishes that there was no profit to the defendant.

The following are additional findings of fact upon which the above conclusion is founded:

Peavy-Wilson Lumber Company rents to most, but not to all, of its employees, dwellings in the community of Holopaw. There is no requirement that an employee live in a company-owned dwelling. Each dwelling is rented at a flat price per room per month, including water and light service, and generally there is a waiting list of employees seeking to rent houses. The water supply is from a well six inches in diameter and 360 feet deep (artesian well), and the water is distributed throughout the community by the defendant. All houses are screened and are of the type generally to be found in the sawmill communities throughout the southern United States. The company does not furnish garages for cars, screened-in porches about the houses, inside plumbing, or inside water facilities. Water is piped throughout the community and is available in front of the houses. If the tenant requires inside water and toilet facilities, he makes provision and pays the cost thereof. This is likewise true with respect to electric power for the operation of refrigerators and electric stoves. When the tenant installs a refrigerator, or an electric stove, or both, he personally pays the cost of installation and pays an added power charge per month of $1.50 for a refrigerator and $2.50 for an electric stove. Substantial annual expenditures are made in the repair and maintenance of the houses which have ranged from approximately $4,000.00 to $10,700.00 per annum.

█ Plaintiff, in seeking to show that defendant realized a profit, made no provision for the cost of insurance, or the cost of the risk where the owner is a self-insurer. No allowance was made for bookkeeping expense with respect to either the dwellings or electric lights and water; nor was allowance made for property taxes, and no effort was made to ascertain and apportion them. No provision was made for the cost of collecting rent, nor was consideration given to the rent that was not collected. In the distribution of electricity and water, no consideration was given to the cost of fuel, no allowance made for cost in connection with pumping the water.

Travel Time.

A consideration of this subject excludes mill employees, and involves only the employees engaged in defendant's logging operations. These employees had a definite work place, well known to all of them, situated at or near the point where timber was being felled. They were and are required to report for work at that place, and at no other.

Defendant's plant and village at Holopaw are located on the Florida East Coast Railway, which extends north through the timber tract and on to the east coast of Florida. The distance from Holopaw to the south end of the timber tract in Osceola County is nine miles; to the extreme north end of the timber tract, twenty-seven miles. The main part of the timberlands in Orange County has a width of from twelve to fifteen miles, and the maximum length north and south is twelve miles. The south boundary line of the timber tract in Orange County is fifteen miles from the plant. The state paved highway extending from Holopaw to Orlando crosses the westernmost part of the tract in Orange County and skirts the westerly side of the tract in its entirety; a county highway extends from this state highway easterly along and through the tract to the eastern side; another state paved highway extends east from Orlando to the east coast of Florida and skirts the north side of the tract in Orange County for approximately eight miles; a county graded road extends from the north to the south end of the tract near the easterly side. Community roads, which are seldom in good condition,

extend into many parts of the property and roads constructed for the purpose of turpentining the timber reach into almost every section of the tract. There are few sections within the tract (640 acre sections) to which one may not drive in good dry weather in an automobile or truck. The land is what is known as "flat pine woods" with cypress heads and bay heads interspersed. The pine timbered lands are open and easily accessible to travel on foot or by automobile except in periods of wet weather. Orlando, a city of approximately fifty thousand people, is within eight miles of the timber tract nearest to it. To the north of the tract the towns of Ft. Christmas and Bithlo are from one to two miles from the timbered lands. In Orange County the towns of Conway, Pinecastle and Taft are near the westernmost part of the timber tract. However, the heart of the timberlands is not readily and generally accessible to the village employees through the use of the paved highways, county paved highways, and the county graded roads. The community roads and graded roads constructed by turpentine operators through the timberlands are generally impassable to automobiles. Turpentine employees handling the entire turpentining process of the timber have lived and do live at various points throughout the timber tract. Many houses are located throughout the tract, and the villages of Pocotaw and Wewahotee are located within the tract.

The men employed by the company in its timberland operations number approximately 125. They make up crews known as the section crew, the right-of-way crew, the steel gang crew, the skidder crew, cypress log sawyers, pine log sawyers, log loaders, switch engine crew, main line railroad crew, bunching crew, drag line crew, and tractor crew.

The defendant makes no requirement with respect to the place of residence of any employee; their place of work in the timberland is well known to them, and that is the only place at which they are required to report for work. Most of the logging employees reside in the community of Holopaw; some reside elsewhere. However, from a practical and economical viewpoint, the employees can hardly do anything else but live in the village.

The means of travel to and from the timberlands are entirely optional with the employees. They may use such means of conveyance as they elect. At times some of them have traveled to and from work by means of their own automobiles. During most of the time a number of the employees who complete their work earlier than 5:30 p. m., the hour of leaving for the return trip, return to Holopaw in the afternoon by means of the trains of the Florida East Coast Railway.

The company operates from the town of Holopaw in the morning a train to the point of work. This train returns in the afternoon. The train is operated by the defendant as an accommodation and convenience to the employees. It leaves a certain point in the community at approximately the same time each morning and will transport the employees to their work if they desire to ride on it. The same is true of the return trip in the afternoon. The defendant did not and does not require any employee to use the conveyance; they may use any other conveyance or means of travel they choose. However, the employees, from the practical and economical viewpoint can do nothing else but use the work-train; therefore, most of the employees take advantage of the train travel provided for their accommodation and convenience. It is decidedly the most convenient means of going to and from their work and costs them nothing. The major part of the train trip is over the main line of the Florida East Coast Railway. The train in which the men ride is equipped with air brakes; the cars used by them are standard box cars with steel under beams, ceiled inside, and converted into cabooses. The cars have seats built all around the sides inside, and in one car the seats are also constructed down the center. The seats used were built outside and then put in and fastened to the car. They are firmly built in so there is no chance for them to come loose. Three such cars are available to the employees for transportation. The cars are provided with doors, windows and heaters. The men who use these cars testify that they are comfortable to ride in and that they have no trouble in keeping warm in the winter. The cars do not leak except occasionally at points where the stove pipes leading from the heaters extend through the roofs of the cars. In these cars the seating capacity is sufficient for all of the employees to be seated. It is never necessary for them to ride in a cramped or uncomfortable position, nor is it necessary for the employees to keep on the

alert to avoid injury. This train upon which the employees may ride is composed of an engine, a tender, three cabooses, a wood car and a flat car. The wood car is used to haul oil and supplies to be used on the engines that stay in the woods; the flat car is used for the carrying of drinking water for the crews in the woods. The train does not carry any log cars. During the entire period that the company has operated this train no employee has ever been hurt or injured while riding.

The average time required for the trip from Holopaw to the point of work is approximately 60 to 75 minutes, with a like period for the return trip. Ordinarily, it is approximately 10½ to 11½ hours from the time the train leaves Holopaw in the morning until its return in the afternoon in working an eight-hour day. Employees are not checked on the train in the morning or on and off in the afternoon. No supervision whatever is exercised over them, nor do employees of the company do any work before reaching the place of taking up their actual labor or after the cessation of work at the point of actual labor.

The only employees of the defendant who do any walking before reaching the point at which they engage in work are the log sawyers and the right-of-way crew. The cypress log sawyers walk from the railroad track constructed alongside the cypress heads a distance running from 200 to 750 feet to their actual point of work. The average time required for such sawyer to walk from the railroad to where he is cutting in the timber is around 7 minutes. They may return within a like period. Occasionally such cypress log sawyer has to walk in water. Most of the time it is not very deep—rarely would he ever walk in water that is waist deep.

Pine log sawyers when they ride the train, walk from the point where they get off the train to the point of work. This distance varies from practically nothing to a distance of 1500 feet. The time required for the walk would be from practically nothing to a maximum of 12 minutes, depending upon whether the sawyer is cutting alongside the railroad track or a distance of as much as 1,500 feet away. Pine timber is in open woods in which there is no difficulty in walking.

With respect to the contention of plaintiff that the timberlands abound in poisonous snakes, there are only three kinds of poisonous snakes in Florida: the rattle snake, the cottonmouth moccasin, and the coral snake. The evidence does not show a single instance where any employee of the company has ever been bitten by any kind of snake, poisonous or otherwise. Poisonous snakes have rarely been seen in the area where the timber work is being performed. The fact is well known that snakes leave an area in which timber is being felled.

The men composing the right-of-way crew ride a motor car from the point where they may get off the train at the end of the steel already laid down. They walk then a distance anywhere from 800 to 1,000 feet to get to the point of their actual work. At the end of the day they walk back to the point where their motor car was left. The total round trip distance does not exceed 2500 feet. They walk over cleared right-of-way and they can walk the entire round trip distance within 10 minutes. Both their walking and the ride on the motor car comes within the period of their work for which they are paid.

From the evidence in this case it appears (1) that the train furnished by the defendant upon which the employees may ride to and from their work is furnished as an accommodation and convenience to the employees; (2) that the defendant's employees in the timberlands have a definite place to work, to them well known, at which they are required to report for work, and such employees are not required to report to any other place; such employees are not checked on the train in the morning or on and off in the afternoon; they may travel to their place of work by whatever means they choose; (3) from a practical and economical viewpoint, the employees can do nothing else but use the free work-train; (4) the time expended by the employees in traveling and walking is for the benefit of the employees as well as for the benefit of the defendant and in the furtherance of its business.

The plaintiff's contention is that time spent by defendant's employees in traveling and walking to and from the woods is an integral part of such employee's work and should be paid for according to the standards provided in the Act. It is the plaintiff's position that these woods employees have begun their working day when they report and meet at the track where the labor train is waiting to transport

them to the woods, and that their working day does not end until the labor train has returned them to the same meeting place.

The Administrator's Interpretative Bulletin No. 13, issued in July, 1939, and distributed to employers, including the defendant, contained the following explanation of "hours worked": "9. The problem of travel time, in relation to hours worked, arises in a great variety of situations and no precise mathematical formula will provide the answer in every case. The question is often one of degree; if the time spent by an employee in traveling is reasonably to be described as 'all in a day's work,' such time should be considered hours worked under the act. * * * 12. If a crew of workers is required to report for work at a designated place at a specified hour and all the employees are then driven to the place where they are to perform work, the time spent in riding to such place should be considered hours worked. Similarly, the time spent returning from the place at the close of the day's work should be considered hours worked."

■ While the Administrator's interpretative bulletins do not have the same binding force as regulations issued pursuant to explicit statutory authority, they are entitled to great weight. United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. In the latter case, decided on June 8, 1942, the Supreme Court said: "While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." 62 S.Ct. at page 1221, footnote 17.

There have been varying conclusions made by our courts of first instance concerning the classification of travel time as to whether it be work-time or not. The strongest case in calling travel time work-time is that of Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, D.C., 40 F. Supp. 4. The time spent by the underground ore-mining employees in being transported from the surface to points of varying distance below the surface and back again at the end of the shift was the type of time before the court in that case.

As a fact the court decided that there was nothing restful or pleasurable for the laborers in this trip. "The cars in which the employees have been transported have not been designed for comfort, have frequently been merely ore cars bearing remnants of iron ore muck. The cars have been nearly always crowded to the extreme. The positions which the men have been required to assume during the transportation varies from a crouch with their bodies overlying one another to a rigid propping of legs and arms against the sides of the car and the fellow passengers. These positions were assumed partially because of the press of human bodies in the cars and partially because of the necessity of keeping head and body in a deflected position in order to avoid injury from collision with low points in the roofs of the mine slopes or with projections from the roofs. These conditions have occasionally resulted in injuries of various kinds to the employees when the required degree of restraint and alertness has been relaxed. The trips were, of course, in the comparative darkness and enclosure of an artificially lighted mine. The air was humid and malodorous, the ventilation relatively poor and the heat increasing with the descent into the mine. These conditions are recited not for the purpose of censure of the plaintiffs' manner of maintenance of their mines, for these conditions may well be normal conditions in iron ore mines and practically inevitable. Nevertheless, the conditions are clearly conditions peculiar to the occupation of the men in the class represented by the defendants, conditions replete with hazards, conditions requiring physical exertion and mental alertness, and conditions unpleasant and burdensome to those encountering them." 40 F.Supp. 9.

We believe that the situation just described is so different from the situation in the instant case that the conclusion in the Muscoda case should not be the conclusion here. An additional factual difference in the two cases is that the transportation in the Muscoda case was under the strict control and supervision of the company; contra in the instant case.

We shall not make the detailed comparison of the case of Sunshine Mining Co. v. Carver, D.C., 41 F.Supp. 60, and the instant case, because we believe that this cited case classifies factually with the Muscoda case since it involved time spent by the employees of a mining company in

travel from the portal of the mine to their usual place of work in the mine. It adds nothing new.

In Dollar v. Caddo River Lumber Co., D.C., 43 F.Supp. 822, the court specifically held that there was nothing due the intervenor for overtime under the following circumstances: "* * * that most of the time between the dates mentioned in this paragraph he (intervenor) was employed as a tong-hooker and was transported from his place of residence to the place of work by the defendant in a truck or other conveyance furnished by the defendant; that the time actually consumed by the intervenor in going from his home to his place of work in a conveyance furnished by the defendant and in returning from his place of work to his home in the same conveyance was not calculated by the defendant in the payment made to him for overtime worked; that the conveyance furnished by the defendant to the intervenor and others was furnished as an accommodation to the intervenor and other employees and they were notified by the defendant that the conveyance would leave a certain point at a certain time and that if they desired to be conveyed to and from their work that they would be so conveyed upon being present at the time the conveyance left for the place of work and returned from the place of work to their homes; that the defendant company did not require the intervenor or any other employee to use such conveyance and the intervenor and other employees were at liberty to use any other conveyance they might desire; * * * that there is now nothing due the intervenor for overtime." 43 F.Supp. at page 823.

In order that we might show the different conclusions as to whether the time be work-time or not, depending upon the factual background, we make the following quotation from the case of Walling v. Dierks Lumber & Coal Company, D.C. W.D. Ark., decided on November 13, 1942 (Not to be reported): "Defendant provides a conveyance upon which its employees may ride if they choose from their homes (or wherever they may choose to catch the conveyance along the road it travels) to their work places and return. This conveyance is furnished by defendant as an accommodation and convenience to the employees, and they were and are notified by defendant that the conveyance leaves a certain point at a certain time and will transport them to and from their work if they desire to ride in it. The defendant did not and does not require any employee to use such conveyance and the employees were and are at liberty to use any other conveyance or means of travel they may choose, and at times the employees, or some of them, would and do provide their own means of transportation to and from their work. * * * The time spent by the employees complained of in traveling to and from their work, whether on and by their own means or on a Company conveyance provided and furnished as an accommodation and convenience to them, is not 'time worked' or time for which they are legally entitled to receive compensation under the Fair Labor Standards Act."

An expression from a Louisiana Federal court is given us in the case of Bulot v. Freeport Sulphur Co., D.C.E.D. La., 45 F.Supp. 380, decided June 3, 1942. It was the claim of plaintiffs and intervenors that time spent by the employee in traveling to the scene of his day's work "by means of the free motor boat transportation * * * made available to him by his employer" and "of which the employee, entirely at his option, might make use" for his free transportation was time worked. The court rejected the contention, specifically holding that "time spent by plaintiffs and intervenors in travelling from their respective homes in order to report for the doing of their work at the defendant's plant or mine premises at Grand Ecaille" was not "time 'worked'" for which plaintiffs and intervenors were entitled to be compensated and paid under the Fair Labor Standards Act of 1938. The court concluded: "Defendant Freeport Sulphur Company is not liable to plaintiffs and intervenors for any sum whatever, and their herein-asserted respective claims to be paid for the average 90 minutes per day, elapsing in travel, and in 'whiling away' time on the company premises next immediately preceding, and following, the doing of their 'work' in producing goods for commerce, should, therefore, be dismissed at their costs." 43 F.Supp. at page 381.

Of course in this latter case the total travel time was ninety minutes per day, while in the instant case a much longer period was involved; we have determined it as a fact to be 120 to 150 minutes per day.

On the point of whether the travel be enjoyable or whether it be under vexing and dangerous conditions, we believe the instant case to be halfway between the two

mining cases we have cited and this latter Bulot case.

■ We have said much already about discerning the intent of the lawmaker in the enactment of 3(m); we should apply ourselves in trying to discern the intent of the lawmaker as to what is time worked when travel time in the various industries is being considered. We have seen that the courts have called certain travel time "time worked", and other travel time not time worked. It may well be assumed that Congress never did in truth actually have any specific intent on the subject. It is to be opined that the Administrator enjoys legally the function of classifying travel time as to whether it should be paid or not paid. But the Administrator's regulation, of necessity, has to be couched in general terms, and the courts still have to make the particular classification, according to the actual facts of the case arising.

In this case, the daily three hours of travel time become overtime hours, since the worker has put in his full eight hours. If these be considered "time worked", the statute places these three hours at one and a half times the regular rate of pay. Then this is doubled against the company by the Statute. § 7(a), 29 U.S.C.A. § 207(a). The three hours of time, which really brought the company nothing, become nine hours per day at full pay. Why was not time used in travel to and from the actual place of work—a very commonly existing and necessary situation—allowed at one-quarter or one-half pay instead of at one and one-half pay, and without doubling? The answer, we believe, is that all the various detailed and practical applications of such general legislation as the F.L.S.A. cannot be provided for in the initial legislation.

■ Since the accommodation is furnished free by the defendant, and the necessity of the travel is the result of necessary economy in sawmill operations, and the village system is such a great improvement for the laborers in sawmills from the previous condition of the portable sites in the forest, and the provisions of the law are that defendant will have to pay three hours' work-time for only one hour of travel when during that hour no actual labor is performed, we are compelled to the conclusion, both legally and equitably, that this travel time is not work-time under the Act.

The walking time consumed by some of the laborers between the time they get off the work train and the time they reach the actual point where they do work is so short that the issue is insignificant, and accordingly we shall not allow it as work-time. The only types of laborers engaged in logging operations who have any walking to do are the log sawyers and the right-of-way crew; they engage in piece work and get, for about five hours of work per day, an amount considerably in excess of eight hours per day at the minimum wage.

■ The oral arguments as well as the briefs in this case are silent on a point that we should like to develop. It may be there is nothing in the point. In the southern pine industry, the sawmill plant in cost reaches the hundreds of thousands of dollars; as an economic necessity it must be used to exploit hundreds of thousands of acres of timbered lands. The acreage next to the mill plant requires no travel time by the laborers to and from the place of work in the forest; but it follows that there is a period of time in the exploitation by the mill plant of the acreage economically joined to it when there will be a distance of ten, twenty, or even thirty miles from the place where the tree is felled in the forest to the place where the saw is located which it is destined to reach. So, we must assume that the situation as exists in this present case as to travel time is one of common occurrence with every large-scale sawmill operation in the southeastern United States. The mill owner offers transportation free, and there has arisen, as a matter of custom, the practice that the employees engaged in logging operations are taken from their homes or sleeping quarters to the place of work in the forest in the early morning, and back again to their homes at the close of their day's work in the evening.

■ But we must bear constantly in mind that each corporation engaged in sawmilling is an active competitor in the world's market of every other engaged in the cutting of pine in the same general area. If the mill owner has to assess as an item of cost, travel time as overtime (of necessity it must become overtime in order to get eight hours of work in the forest), he is placed at an economic disadvantage as compared to his competitor who is not in that situation, may never be because of small holdings, or who has not.

reached the period in cutting operations where the logs have to come from a great distance to the mill. We must not forget, and here is the point of this discussion, that Section 2 of the Fair Labor Standards Act, 29 U.S.C.A. § 202,—Congressional finding and declaration of policy—reads as follows: "(a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers * * * (3) constitutes an unfair method of competition in commerce; * * *."

So, it would seem that in the instant case, where the one hour of travel time by the laborer would mean the payment for three hours of work time by the employer, the cast employer would certainly be placed in an unequal position to compete with the one not cast, the one who has no such travel time to meet. Consequently, to follow the demand of the plaintiff in this matter of travel time is to go in reverse of or in opposition to subhead 3 of Section 2, above quoted.

So, we are taking the clear-cut position that the travel time here is not work-time under the Act. We are not predicating this conclusion on the ground of any agreement between the employer and the employees. Johnson et al. v. Dierks Lumber & Coal Co., 8 Cir., 130 F.2d 115; Overnight Motor Transportation Co., Inc., v. Missel, 315 U.S. 791, 62 S.Ct. 641, 86 L.Ed. 1195; Fleming v. Warshawsky & Co., 7 Cir., 123 F.2d 622; Carleton Screw Products Co. v. Fleming, 8 Cir., 126 F.2d 537; United States v. Morley Construction Co., 2 Cir., 98 F.2d 781. Nor is it sought to rest it on the premise that such travel time in the lumber industry as a matter of custom has never received payment; nor are we basing the conclusion on the inability financially of the defendant to pay for the travel time, particularly in its multiple.

The words of Chief Justice Taft in Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, quoted by Chief Justice Hughes in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 397, 57 S.Ct. 578, 584, 81 L.Ed. 703, 108 A.L.R. 1330, are words referring to ability to pay maximum hours and minimum wages basically and are not accurately applicable to the question of overtime in this case, wherein the defendant is already found to be paying-the minimum wage, for the court said: "And Chief Justice Taft forcibly pointed out the consideration which is basic in a statute of this character: 'Legislatures which adopt a requirement of maximum hours or minimum wages may be presumed to believe that when sweating employers are prevented from paying unduly low wages by positive law they will continue their business, abating that part of their profits, which were wrung from the necessities of their employees, and will concede the better terms required by the law, and that while in individual cases, hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed, and so to that of the community at large.'" See, also, Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 58.

Since composing the above on travel time, the Muscoda case, supra, has been affirmed in its declaration that time spent underground from the time the laborers are required to report at the portal of the mine until they emerge therefrom at the end of their shift, less the fixed lunch period during which the employees are relieved of all duties, was work-time. See Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123 et al., 5 Cir., 135 F.2d 320, decided March 16, 1943. After reading the full text of the opinion of the circuit court we find no reason to change our reasoning and holding. The factual differentiations drawn previously command the opposite conclusion.

### Community Medical Service.
### Doctor, Nurse, and Medicine.

The plaintiff contends that the deductions for medical attention were excessive, and also that the deductions for drugs were excessive, and that, since the majority of the employees agreeing with the defendant for the medical and nursing service were paid but their minimum wage, there resulted violations of the Act. We believe the plaintiff's conclusion is motivated in the main by the fact that the company's own records showed yearly a clear and substantial excess of income over expense. We believe the defendant's explanation at the trial of this case on this subject is true, because the bookkeeping made allocations of the doctor's salary, etc., which were substantially erroneous,

and more, the bookkeeping showed no expense whatsoever for administrative or clerical costs, etc.

On this phase of the case we are using verbatim the finding of the defendant furnished the court, with the exception of the exclusion of one sentence.

"Charges Made Employees on Account of the Community Medical Service Which Included the Services of the Doctor, the Nurse and Medicine

"The defendant made available to each employee at a charge of $1.00 per month the services of a full time physician and a full time trained nurse. Such charge permitted each employee, as well as every member of his family, if he had a family, to consult or call upon the service of the doctor and nurse as frequently as the employee and the members of his family might desire. The doctor and the nurse were employed by the company (defendant). Neither was permitted to engage in outside practice. Said payment by the employee of a dollar per month did not include the service of the doctor and nurse in obstetrical cases, cases involving personal violence, or charges for filling out insurance papers not connected with workmen's compensation. In such instances the doctor and nurse were permitted to make additional charges as follows: an extra charge of $10.00 on the occasion of the birth of a child for all treatment and care in connection therewith; a charge of $3.50 for all care given on account of injuries growing out of personal violence, and a fee of 50¢ for filling out insurance reports not involving workmen's compensation cases. All of the moneys received on account of such charges were paid over to and retained by the doctor and the nurse, the defendant receiving no part thereof. In the event of syphilitic treatments a charge of $1.00 per treatment was made to apply to the expense of the medicine used. Each of such special charges was in an amount far less than would ordinarily be charged for the service of a doctor and nurse. With such exceptions, the charge of $1.00 per month paid for all services which such doctor and such nurse might render, and all such service which the employee and members of his family might require of the company doctor and the company nurse. Whether the employee availed himself of the services of the doctor and the nurse on such basis was entirely optional. If he wished such service the $1.00 a month was charged to his pay roll account. If he did not, nothing was charged. Most of the employees took advantage of such service. Some of them did not. Whether they did or did not had no bearing on their employment.

"Under the Florida Workmen's Compensation Act, F.S.A. § 440.01 et seq., the defendant is a self insurer. Where employees were injured in their line of work or in such manner as to be entitled to medical care, hospitalization, and medicine under the Workmen's Compensation Act the total expense thereof was paid by and charged to the defendant. Injuries received by employees in the line of employment which would come within the terms of the Workmen's Compensation Act appear to have been few.

"In connection with the community medical service employees purchased of the company through the doctor and nurse, drugs required in treatment and the charges on account thereof were charged against the employee's pay roll account. The prices charged by the company on account of drugs and medicines used were very much lower than customarily charged by druggists in the central Florida area. On the less expensive drugs the defendant made a mark-up on the net invoice price of ten per cent. and on the more expensive drugs a mark-up of approximately five per cent.—the purpose of which was to cover expenses and loss from spoilage and deterioration. The evidence conclusively shows that there was no effort on the part of the defendant to make money on account of the sale of medicinal drugs and medicine to its employees.

"Prior to the institution of this suit, and for some time thereafter it is apparent that the defendant made no attempt to scientifically allocate charges or cost as between the medicine sold, the so-called hospital account or the Workmen's Compensation account. Prior to the trial, however, a study was made by said doctor, nurse and the defendant's bookkeeping department of the appropriate method of allocating costs. The testimony of all of them shows that not to exceed 2½% of the time of the doctor and nurse was spent upon workmen's compensation cases. Nevertheless the defendant charged 10% of the total salary of the doctor and nurse to such cases. Medicines used in workmen's compensation cases were charged to the defendant and credited to the drug account.

The salary paid the full-time company physician was at the rate of $350.00 per month, or $4,200.00 per year, and the nurse was paid $140.00 per month, or $1,680.00 per year, a total of $5,880.00 per year. The collections from employees on account of the $1.00 per month charge ranged from $4,589.40 per year to $5,100.12.

■ "It is apparent from the evidence in this case and all of it that when the accounts are appropriately apportioned the defendant made no money by reason of the community medical service, doctor, nurse and medicine, but sustained a substantial loss—a loss through the years 1938–1941 inclusive of not less than $3,000.00. In addition to the loss so sustained the defendant paid for the account of its employees, or the members of their families, medical bills incurred through the securing of the services of specialists and hospitalization in cases not connected with workmen's compensation outside the community of Holopaw to the amount of $4,032.01 in the years 1938–1941 inclusive. So the total cost during said period to the defendant of its contributions to the community health of its employees over and above receipts —receipts from the $1.00 per month and the sale of drugs—exceeded $7,000.00.

"The evidence shows the result to have been that the community of Holopaw had the finest health record of any community in the counties of Orange and Osceola, Florida. * * * It appears that the employees and the families of employees, white and negro, greatly benefited on account thereof. It is apparent from the testimony that the service was greatly appreciated by the employees. The contention made by the plaintiff that in this service the negro employees and members of their families were discriminated against, is unsupported by the evidence.

"If any plan of group health service provided by defendant for its employees is to be workable, the amount charged per month has to remain constant for considerable periods of time. Defendant cannot and could not be expected to adjust its charge each month for monthly fluctuations in receipts and costs. It has not been shown as to any month that defendant's receipts exceeded its costs as to such month. Certainly the amount charged by defendant during the time involved in this suit did not at any time exceed what defendant might reasonably believe was necessary to be collected if its costs were to be realized. Of this there can be no doubt."

We find for the defendant on this phase of the case.

## Tools.

■ The defendant charged its loggers with saws, axes, axe handles, wedges, and coal oil. The Regulation of the Administrator is as follows: (Sec. 531.1)

"(d) The cost of furnishing 'facilities' which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.

"The following list of facilities found by the Administrator to be primarily for the benefit or convenience of the employer is meant as illustrative rather than exclusive: (1) Tools of the trade and other materials and services incidental to carrying on the employer's business; * * *"

We determine and declare the regulation to be legal.

The defendant contends that the sawyers of both cypress and pine logs were paid on a contract basis under the terms of which they furnish their services and their respective tools. We find this to be true. These laborers never worked overtime. A computation on the basis of eight hours per day and forty hours per week (no matter how much less they actually worked) will show them to be amply paid above the minimum wage per hour. The plaintiff recounters with the statement (but we do not use this contention for our decision) that these woods laborers worked much longer than the hours recorded and that their earnings were almost always less than the amount required by the Act, and often less than the minimum wage.

■ It has long been the custom of the trade that log cutters are to furnish their tools. This custom may not prevail against nor supersede the requirements of a regulatory law. Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, D.C., 40 F. Supp. 4, and cases cited therein.

We believe the laborers should be furnished their tools free of charge, as the tools should be considered fundamentally a part of defendant's plant. Otherwise it could as well be deduced that the laborer working at the mill should be charged a rent use of the large plane or the large saw which he uses at the mill in the performance of his work. We believe that the

workers will show their appreciation under this arrangement and that they will use fewer tools than formerly to do the same work. We believe that they will verify our prediction and thus prove themselves to be trustworthy caretakers.

### The Holopaw Savings & Investment Company.

In January, 1939, beginning as of January 10th, there was organized in the community of Holopaw a very small cooperative savings and investment company which had as a name Holopaw Savings & Investment Company. It discontinued business and started liquidation September 16, 1941. It was started by an employee of the defendant, W. W. Goode, a billing clerk and the bookkeeper of accounts pertaining to lumber sales. Mr. Goode interested Max Handley, also a bookkeeper for the company and the son of Mr. D. L. Handley, the operating vice president of the company at Holopaw, in this investment company. The plan of organization contemplated that those who cared to could invest small monthly amounts in this organization and such investments would be made use of: (1) in making small loans to the member investors, and (2) in investments in securities. Obviously the said Investment Company was patterned after Federal Credit Unions. Mr. Goode and Max Handley acted as co-managers in the making of loans and the handling of such small investments as were made, and without charge. The Holopaw Savings & Investment Company had practically no expenses, none from the standpoint of moneys paid in by way of investment, and little if any from the standpoint of operations. It had quite a substantial number of small investors, many of whom were employees of the company but some of whom had no connection whatever with the company. Under the terms of the understanding, pursuant to which each person paid his money into the investment company, he had the right to withdraw the same at any time and to ultimately withdraw his pro rata of all earnings, if any, up to the time of such withdrawal. Each investor, regardless of the amount invested, had one vote with respect to the affairs of the organization. Up to October 7, 1940, this organization made loans to its members only but as of that date it qualified under the Florida Small Loan Act, F. S.A. § 516.01 et seq., and from then until September 16, 1941, the date upon which it began liquidation, it made loans to non-members as well as to members. During the period of its existence its total loans were $18,182.67. Of this amount $11,244.13 was loaned to members who were investors; $6,163.54 was loaned to employees of the company who were not members; $775.00 was loaned to persons neither employees nor investors. The average interest return on the money loaned was a fraction under 4.9%. Total interest earned from all loans made during the entire existence of the investment company was $889.51. Of this amount it appears that $301.52 in interest was derived from loans made to employees of the company not investors in the investment company. All of the loans were made in small amounts, practically all of them being a hundred dollars or less. A few were in excess of a hundred dollars, and one loan was $330.00. There were four loans of as much as $220.00. The Florida Small Loan Act on loans up to $300.00 permits an interest charge of 3½% per month. However, loans made by the investment company were on the basis of a minimum charge of $1.00 or at the rate of 10% per annum. All loans were made on precisely the same basis whether made to investing members or to employees of the company not members of the investment company or to persons neither employees of defendant nor members of the investment company. A negro in the community of Holopaw could borrow money from the investment company on precisely the same terms as to interest charges as could the co-managers of the investment company, W. W. Goode and Max Handley.

When an employee of the defendant borrowed money he could either make his payments directly to the investment company or if he authorized his payments to be charged against his pay roll account that was done.

 Since this corporation has discontinued business and is in process of liquidation, we need not devote more attention to this phase of the case than to say that where the laborers are paid the bare minimum wage, it is an infringement of the Act and of the Regulation thereunder to operate such an investment company in the manner and with the clerical forces interconnected as above narrated, but we see no need for or purpose of the issuance of an injunction in any degree.

### Deductions for Milk and Ice.

We believe the defendant has furnished an accurate finding of fact on this phase of the case and we make a very full quotation of it.

"The community of Holopaw did not have either an ice manufacturing plant, or an adequate supply of milk. The employees of Peavy-Wilson Lumber Company, Inc. desired daily deliveries of ice and an adequate daily milk supply. For a period of time employees secured these necessities wherever they could. Then the vice president of the company in charge of operations at Holopaw sought to arrange for an adequate daily supply of milk and ice at the cheapest possible price.

"To secure satisfactory daily ice deliveries, the ice companies at Melbourne, St. Cloud and Kissimmee were requested to submit bids. The cheapest price on daily deliveries of ice to employee customers was submitted by The Southern Service Company, an ice manufacturer situated at Kissimmee, twenty-five miles away. Said concern was willing to make daily deliveries of ice to employees at the cheapest price, provided: (1) It might make sales on credit to company employees who wished credit, and (2) that such credit sales, at the request of the purchaser employee, would be charged to the employee's pay roll account, the company attending to all the bookkeeping details, making the collections, guaranteeing the accounts and remitting the full amount of the collections to the supplier of ice, Southern Service Company. For such service of the defendant company the ice company offered to pay 15% of the credit sales, a cost it estimated to be much less than the cost to it of attempting collections on credit sales. The defendant company declined the 15% offer and undertook the service for the ice company at a charge of 10% of the credit accounts. Such charge the defendant company estimated would reimburse it for the costs incurred. Through such arrangement the employees of Peavy-Wilson Lumber Company, Inc. were enabled to purchase 250 lbs. of ice, with daily 12½ lb. deliveries at their door in Holopaw, at a charge of $1.50, whereas, 25 miles away, at the point of manufacture in Kissimmee, if the company made like deliveries of 250 lbs. of ice to its customers at their door, the charge was $2.00. The saving to the employees of Peavy-Wilson Lumber Company, Inc. was 25%. Said ice company charged employees of Peavy-Wilson Lumber Company, Inc. at Holopaw two dollars and a half for 500 lbs. of ice, delivered at their door in 12½ lb. blocks, whereas, at Kissimmee, at the point of manufacture twenty-five miles away, the customers of the ice company paid $3.20 for 500 lbs. of ice, delivered in 12½ lb. blocks—a saving to the employees of Peavy-Wilson Lumber Company, Inc. of 22%. This advantageous arrangement to the employees of Peavy-Wilson Lumber Company, Inc. was continued until December 1941 when objection was raised to such practice by the Wage and Hour Division of the Department of Labor. Whereupon the company discontinued the arrangement and the ice company ceased taking from defendant's employees orders upon the defendant for the purchase of ice and the defendant discontinued the bookkeeping, the making of collections on account of such credit sales, and the guaranteeing of the accounts of the purchaser employees. The ice company also ceased making many credit sales. That the employees benefited from such arrangement as long as it was continued is apparent. That the Southern Service Company, the supplier of ice, through such arrangement saved a substantial cost and loss on account of the cost of collections and loss on credit accounts seems elementary. The charges made by the defendant and collected from the ice company for its services, bookkeeping, collecting and guaranteeing of accounts, averaged less than eight dollars and seventy five cents per month from the time the Fair Labor Standards Act went into effect to and including December 31, 1941. On such basis it does not appear that the company could have made any money or profited on account of the ice arrangement.

"Peavy-Wilson Lumber Company, Inc., has never, at any time in its operations in Florida, furnished ice to its employees for use in making ice water. Nor has it furnished them iced drinking water. It has at all times furnished its employees with pure palatable water from a six inch diameter well, 360 feet deep (artesian well). This same water the company has at all times transported and furnished to its employees who might be working in the logging woods. Some of the crews working for the defendant desired ice so as to have iced drinking water during the summer season—other crews did not. If the members of a crew wished iced drinking water, during the summer season, each member

either subscribed a small amount of cash or authorized an order to the company for such amount to be charged against his pay roll account. Through such contributions and orders, the foreman of the crew would purchase from The Southern Service Company, the ice manufacturer at Kissimmee, a ton of ice at $10.00 per ton, and such ice would be delivered on work days in daily deliveries of 50 lb. blocks. There is no controversy upon the point that the company has never at any time in its Florida operations furnished ice. It is conceded that it never did. Likewise, there is no controversy with respect to the fact that the employee crews who wished to have their drinking water iced cooperated together voluntarily in either subscribing the money or in having their pay roll accounts charged with the money necessary to purchase the ice. The point made by the plaintiff is that, if ice was used by the employees while at their work for the purpose of icing drinking water, the company was required to pay for same. It seems, as a matter of fact, that the employees would have the same right to cooperate together in the purchase of ice with which to make iced water to drink as they would have to cooperate together in purchasing Coca-Colas to drink. * * *

▇▇▇ "In the summers of 1936 and 1937, the employees in the planing mill decided that instead of buying ice they would purchase and install two electrically refrigerated water coolers. This they did. Each of the employees, who wished to, gave an order on his pay roll account for the amount of his subscription. The subscriptions were at $1.30 or $1.36 per employee. These subscriptions, to be charged against the pay roll accounts of the employees at their direction, were presented to the company with the request that it purchase for the employees, at cost, such electrically refrigerated water coolers. This the company did and such coolers were paid for prior to the enactment of the Fair Labor Standards Act. In the spring of 1939 employees in the sawmill of the defendant, through an identical arrangement, of their own volition and not at the suggestion of the defendant, likewise purchased an electrically refrigerated water cooler. The purchase of this cooler was handled in exactly the same manner as the other two, excepting that when the requests and orders of the employees were presented for the purchase, the company of its own voli-

tion paid one half of the cost. It is clear that the defendant derived neither profit nor advantage from said transactions.

▇▇▇ "With respect to the milk supply, the employees derived milk from two sources. One source of supply was from a dairy operated by a Mrs. Armstrong at Kenansville, a village near Holopaw. She sold milk to a select list of customers in Holopaw, very dependable from the standpoint of pay. She attended to her own collections, her own bookkeeping with respect to sales made to employees of Peavy-Wilson Lumber Company, Inc. and assumed the risk of her own credits. With her sales Peavy-Wilson Lumber Company, Inc. had nothing to do. However, her milk supply was too limited to fill the requirements of the employees of Peavy-Wilson Lumber Company, Inc., with the result that arrangements were made with Red Top Dairy at Kissimmee to make daily deliveries of milk to said employees at Holopaw. The arrangement was upon precisely the same basis as that made for the supply of ice, and where an employee wished to, instead of paying cash to the milkman or handling the account himself, he gave an order on the company to pay the Red Top Dairy and charge the amount of the milk bill to his pay roll account. Where such orders were given, the company handled the bookkeeping, the collection, guaranteed the account and made remittances directly to the Red Top Dairy. For such services on the credit sales the Red Top Dairy paid the defendant company 10%. The price charged defendant's employees at Holopaw for the milk from the Red Top Dairy, the place of business of which was at Kissimmee, twenty-five miles away, was precisely the same price at which it sold its milk for cash in Kissimmee; said price was that fixed by the Florida State Milk Control Board for the sale of milk and the same price at which Mrs. Armstrong sold milk to her customers in the community of Holopaw. The one difference between the handling of the milk account and the handling of the ice account was that the Red Top Dairy paid the defendant nothing for its service in the years 1940 and 1941. The average monthly payment, which the Rep Top Dairy made to Peavy-Wilson Lumber Company, Inc., for its services in bookkeeping, making collections and guaranteeing of the accounts on credit sales made in the year 1938 and 1939, was $8.72, which money the Red Top Dairy paid directly to Peavy-Wilson

Lumber Company, Inc. When in December, 1941, the plaintiff objected to the practice with respect to the handling of the milk account—notwithstanding the fact that defendant had made no charges for the handling of this account for approximately two years—the defendant immediately discontinued the practice and the Red Top Dairy shortly thereafter ceased making daily deliveries and the supplying of a number of the customers it had theretofore supplied with milk. How such an arrangement while it continued could have been otherwise than of substantial benefit to the employees is not apparent. Neither is it apparent how there could be a valid objection to the arrangement between the Red Top Dairy and the Peavy-Wilson Lumber Company, Inc., by which the Red Top Dairy paid to the defendant a nominal sum to reimburse it for the cost incurred in handling its credit accounts at Holopaw. It appears from the evidence that the discontinuance of the arrangement was detrimental to both the milk supplier and the employees who took advantage thereof."

The plaintiff likewise has made for us a fine statement of the facts and the applicable law on this subject, and we quote very fully from it:

"As has been stated, it is the position of the Administrator that deductions can be made from the wages of employees only under the conditions established by Section 3(m) and the Administrator's Regulations issued pursuant thereto. The Administrator in his Interpretative Bulletin No. 3, has stated that no objection would be made to a voluntary assignment or order of an employee to pay a sum for the benefit of the employee to a creditor, donee or third party, 'provided that neither the employer nor any person acting in his behalf or interest directly or indirectly, derives any profit or benefit from the transaction.' (Interpretative Bulletin No. 3, U. S. Department of Labor, Wage and Hour Division, paragraph 17.) The practical reason for this proviso is fairly obvious. It conforms with the basic purpose of Section 3(m) to protect the employee's wage from exploitation by his employer. Whether or not in a *particular* case the employee is any the worse off by reason of the fact that the employer benefits from the assignment, the opportunities for exploiting the transaction nevertheless exist. For practicable enforcement and effective administration of the Act on a nation-wide basis, the Ad-

ministrator's interpretation prohibiting such assignments where the employer derives a benefit or profit is certainly reasonable, if not indeed essential. Because the Administrator's interpretations represent the 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new,' they are entitled to 'great weight.' United States v. American Trucking Ass'ns, 310 U.S. 534, 549 [60 S.Ct. 1059, 84 L.Ed. 1345]; and see Missel v. Overnight Motor Transp. Co. [4 Cir., 128 F.2d 98], certiorari granted 1942, [315 U.S. 791] 62 S.Ct. 641 [86 L.Ed. 1195]; Bumpus v. Continental Baking Co., [6 Cir.] 124 F.2d 549, 552 [140 A.L.R. 1258].

" * * * To countenance practices of this character is merely to open the door to myriad ways of evading the Act. The letter and purpose of Section 3(m), as well as practical administrative considerations, support the view that such charges constitute violations of the Act when the deductions cut into the requisite minimum wage and overtime compensation, as has been the case with respect to many of defendant's employees."

Since the defendant has been paying but the very minimum wage provided by the Act to the great majority of its employees (210 out of 325), we feel the legal conclusion of the plaintiff to be correct. Under the circumstances, this previous practice, now discontinued for two years, must be condemned and a prohibition should be set against its resumption.

In this phase of the defendant's operations, as well as in all the others, if the wage paid were to be raised but by a few cents, the previous method practiced, which really has brought practical beneficent results, could be resumed without offense to the wage provision of the Act.

### Furnishing of Fuel Wood.

The defendant persisted in showing that in its furnishing of fuel wood, delivered to its tenants, at $1.00 per truck load, when it could readily have sold it to others at $2.95, it lost yearly a sum of surely over $10,000.00. The original complaint included this item as a violation, but, by oral amendment, it was withdrawn. We admitted the evidence, over objection, because we thought it relevant since no other relation between the employer and em-

ployee had been left out, and the trial, for proper hearing, should bring all the activities of the defendant within probative range. Moreover, if it became true undebatably that the defendant could do this one thing for its employees at a loss, it followed, circumstantially, that it might have done other things for its employees at a loss.

██ The defendant urges very strongly that our judgment herein, in case we should find itemized violations of the Act, should be only declarative in character, and not be accompanied by any writ of injunction. We believe that there has been "cause shown" (Section 17 of the Act, 29 U.S.C.A. § 217) for the issuance of the writ to compel a strict adherence to the findings of the court in the particular provisions of the Act we have declared violated, because (a) the defendant did persist (thought it was in legal right to do so) in paying the bare minimum wage under the Act to a substantial majority of its employees; (b) the payment of a few cents more per hour, not to reach 5¢, would have obviated all investigation by the government and this ensuing litigation; (c) there have been a number of violations, though discontinued; (d) the defendant, in our opinion, is not yet a decided convert to, and far from being an apostle of, the Act; and (e) though we are very familiar with and do recognize the fine executive virtues of the present head of the company, we believe that because of his temperament and disposition it would be better to issue the writs. See United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 309, 17 S.Ct. 540, 41 L.Ed. 1007; Federal Trade Commission v. Goodyear Tire & R. Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326; Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395, decided May 25, 1942; Fleming v. Cincinnati Union Terminal Co., 6 Cir., 117 F.2d 1012; Otis & Co. v. Securities and Exchange Comm., 6 Cir., 106 F.2d 579; Sears, Roebuck & Co. v. Federal Trade Commission, 7 Cir., 258 F. 307, 6 A. L.R. 358.

██ The District Courts in numerous other Wage and Hour cases have refused to recognize cessation of violations shortly prior to the filing of suit as a ground for denying an injunction. Holland v. Amoskeag Machine Co., D.N.H.1942, 44 F.Supp. 884; Fleming v. T. Buettner & Co., N.D. Ill., March 1942[1]; Fleming v. Tidewater Optical Co., E.D.Va.1940, 35 F.Supp. 1015; Fleming v. Valdivieso, D.P.R. December, 1941[1]; Fleming v. Kenton Loose Leaf Tobacco Warehouse Co., E.D.Ky.1941, 41 F. Supp. 255; Fleming v. Mason & Dixon Lines, E.D.Tenn.1941, 42 F.Supp. 230; Fleming v. Carpenter Lumber Co., No. 85 M.D.Ga., Nov. 29, 1940[1]; Walling v. Builders' Veneer & Woodwork Co., E.D. Wis. June, 1942, 45 F.Supp. 808.

██ Finally, we realize fully that what is sought here is the statutory writ of injunction, issuing under an action at law (no irreparable injury need be shown— United States v. City and County of San Francisco, 310 U.S. 16, 30, 60 S.Ct. 749, 84 L.Ed. 1050), and not strictly under the action in equity, familiar to the chancery practice.

Conclusions of Law.

██ 1. Defendant and its employees, throughout the period involved in this suit, have been engaged continuously in the production of lumber for interstate commerce and in activities necessary for such production.

██ 2. The minimum wage and overtime provisions of the Fair Labor Standards Act of 1938 are applicable to defendant's employees.

3. The Fair Labor Standards Act is constitutional.

██ 4. The provisions of Sections 6 and 7 of the Act are mandatory and impose an absolute obligation upon an employer subject to the Act to pay the prescribed minimum wage and overtime compensation free and clear. Deductions from such prescribed wages are permissible only upon the conditions imposed by Section 3(m) of the Act.

██ 5. Section 3(m) of the Act is not invalid for indefiniteness and uncertainty. It furnishes a sufficiently definite guide for administrative action and constitutes a valid delegation of power to the Administrator.

██ 6. Under Section 3(m) the Administrator is empowered to determine the "reasonable cost" to employers of furnishing facilities to employees as part of the wages prescribed by the Act. There is no constitutional or statutory requirement that the Administrator hold a formal hearing prior to the promulgation of his determination.

---

[1] No opinion for publication.

7. The Act does not require nor contemplate a determination of "reasonable cost" of facilities furnished by each individual employer. The establishment of a general determination or regulation pursuant to which the cost of such facilities may be calculated meets the statutory requirements and does not violate constitutional requirements of due process. Const. Amend. 5.

8. The Administrator's Regulations, Part 531, issued pursuant to Section 3(m), are legislative in character, and are binding upon the courts unless palpably arbitrary or capricious, or unless unconstitutional.

9. The Administrator's Regulations, Part 531, constitute a valid exercise of the authority conferred upon him by Section 3(m), and are reasonably designed and adapted to achieve the purpose of Congress to protect the basic wage and hour standards. The "actual cost" standard, as defined in the Administrator's regulations, is practicable and reasonable. It cannot be said to be arbitrary or capricious in view of the literal language of the statute, the legislative history, and practical considerations of administrative convenience.

10. There is no constitutional requirement entitling employers to a return on the value of services or facilities furnished in lieu of wages.

11. The Administrator's regulations defining "reasonable cost" are sufficiently definite, certain, and intelligible to constitute valid regulatory measures.

12. The restrictions of Section 3(m) and the Administrator's regulations are applicable irrespective of whether the deductions from wages are voluntary on the part of the employee. A voluntary agreement to permit excessive deductions is no more valid than a direct agreement by the employee to *accept* less than the minimum wage. Voluntary agreements between employer and employee which are prohibited by or inconsistent with the provisions of the law are illegal.

13. Defendant has repeatedly violated Sections 6 and 15(a) (2) of the Fair Labor Standards Act by making deductions from the wages of many of its employees employed at the bare minimum rate prescribed by the Act, as follows:

(a) By discounting at less than face value coupons issued in lieu of wages.

(b) By discounting such coupons through a third party under an arrangement whereby defendant shared the profits and benefits.

(c) By deducting from wages the face amounts of coupons used for the purchase of merchandise, groceries and other goods sold by the company-owned store at prices returning more than the reasonable cost to defendant of furnishing such articles or facilities.

(d) By making charges and deductions from wages for ice and mechanical water coolers.

(e) By making or permitting deductions from wages for loans made to employees by the Holopaw Savings and Investment Company, an association affiliated with defendant in various ways.

(f) By making deductions from wages for milk and ice purchased by employees from third parties through transactions from which defendant secured profits and benefits.

14. Defendant has continuously and repeatedly violated Sections 6, 7, 11(c) and 15 (a) (2) of the Act by failing to keep records.

15. An occupational custom or usage not to pay for travel or waiting time cannot operate to avoid the requirements of this Act of Congress.

16. Defendant has repeatedly violated Sections 6, 7 and 15(a) (2) of the Act by making deductions from the wages of woods employees for saws, axes, and other tools used and needed in their work for defendant.

17. Evidence of repeated violations in the past over a substantial period of time is sufficient "cause shown" to entitle the Administrator to the injunctive remedy under Section 17 of the Act.

18. Discontinuance of violations under official pressure or because of the imminence of litigation, before or immediately after complaint is filed, does not afford grounds for denying an injunction, under Section 17 of the Act. Nor do protestations of good faith and intention to comply in the future constitute grounds for denying injunctive relief.

19. This court has jurisdiction to enjoin defendant from violating the Act in its operations in the state of Florida.

20. The Administrator is entitled to an injunction as to the specific acts of violation itemized hereinabove.